## JENSEN v. LOGAN CITY et al.

No. 5931.   Decided October 19, 1938.   (83 P. 2d 311.)

Rehearing denied December 19, 1938.

*H. A. Sjostrom,* of Logan, and *Homer Holmgren,* of Salt Lake City, for appellant.

*Leon Fonnesbeck* and *Young & Bullen,* all of Logan, and *Bowen & Quinney,* of Salt Lake City, for respondents.

FOLLAND, Chief Justice.

This case is here on second appeal. The decision on first appeal is to be found in 89 Utah 347, 57 P. 2d 708. Reference is hereby made to that case for a detailed statement of the facts. On second trial, the cause was tried by the court sitting without a jury. The trial court made findings of fact, conclusions of law, and entered judgment for the defendants, no cause of action. Appellant assigned eighteen errors and argued them in the brief under six heads: (1) Assignments 5, 8, 9, 10, 11 are directed to insufficiency of the evidence to support portions of Findings of Fact No. 6 and 7; (2) Assignments 12 and 13 are that finding No. 9 is not supported by the evidence; (3) Assignments 6 and 7 are that part of finding No. 6 is not supported by the evidence, and that the refusal of the court to make a contrary finding in harmony with plaintiff's evidence is error; (4) Assignment No. 1 is directed to the court's ruling permitting counsel for Anderson Lumber Company to cross examine a witness called by the other defendant, Logan City; (5) Assignments 2, 3, and 4 raise questions regarding exclusion of offered evidence; (6) Assignments 14 to 18 assign error in making and entering conclusions of law and judgment on the Findings of Fact.

At about eleven-thirty p. m., on March 18, 1933, appellant was walking along the east sidewalk on South Main Street in Logan City when he tripped and fell by his foot being caught in the wire from an adjoining fence and was severely injured by the fall. He brought suit against the abutting property owner Anderson Lumber Company and Logan City. It seems that in the spring of 1933 a group of citizens of Logan organized the Citizens Relief Committee for the purpose of providing work and firewood for unemployed men. The Committee advertised in the local papers for any persons having trees which were not needed to advise the Committee. The Anderson Lumber Company notified the Committee it had such a tree which it would donate for the purposes of the Committee. This tree was just inside a mesh wire fence along the property line. To remove the tree it became neces-

sary to displace part of the wire fence. Mr. Maughan, superintendent of the Logan City electric light department, was an active member of the Citizens Relief Committee. He directed a city employee, J. H. Kent, to supervise the felling of the tree. Kent thereupon went to the premises, loosened the wire from two posts and folded the loosened wire back against the fence standing to the north. He testified he fastened the first, third, and fourth strands securely but that the lower strands were not fastened because of snow then on the ground. Parallel with the fence and three feet therefrom was a cement sidewalk six feet in width. The area between curb and fence line, except the six foot walk, was in parking. The unemployed men were employed by the Citizens Committee to fell the tree and cut it into firewood lengths. The fence was first unfastened early in March and was not restored to its original posts as part of the fence until after the accident on March 18th.

Appellant based his cause of action on the allegation that defendants "folded said net wire back upon itself in such a negligent and careless manner that a part of said net wire where it was folded as aforesaid, projected for a distance of about one foot out, over and upon the paved portion of the said sidewalk, which is one of the public sidewalks of Logan City," etc., and permitted the wire so to remain for about four weeks, and that "its said fence was lying and protruding upon said sidewalk and was obstructing the same and the free use thereof by the public," etc.; that on March 18th at approximately the hour of midnight the plaintiff proceeded along the sidewalk which was "in the said dangerous and hazardous condition as aforesaid and was obstructed as aforesaid  * * * and while walking along the regularly used and paved portion of said sidewalk in a lawful, careful and prudent manner, ran into and against said net wire fence which was then and there still projecting out upon the paved portion of said sidewalk," etc.

The testimony of appellant and his companion (who was with him at the time of the accident and injury) was to

the same effect, and the court found the fact to be as alleged and proved—that the accident happened on the paved walk. Liability was attempted to be fastened on defendants (1) because they folded the fence back in a careless and negligent manner; and (2) because the wire was out over a portion of the paved walk for a period of time sufficiently long to give constructive notice of the dangerous condition.

Appellant contends there was not sufficient evidence to support the assailed findings of fact, Nos. 6, 7, and 9. In order to determine whether there is evidence to support a finding of the court or a verdict of a jury, we should look to evidence which tends to support such verdict or finding rather than to the contrary. It may be conceded at once that there is evidence inconsistent with or contrary to the facts as found by the trial judge. There is also ample evidence of a very substantial character which furnishes adequate support to each fact found by the court. The rule is well established that it is not for this court in a law case to weigh evidence or determine credibility of witnesses. If there is any substantial evidence in support of a finding, it must be sustained.

We shall merely point out evidence which supports the trial court's findings, and not attempt to argue where the preponderance of evidence lies. That was for the trial court.

Assignment No. 5 takes exception to that part of finding No. 6 as follows: That the wire of the fence was folded back "for a distance of 16 feet along and upon the portion of said fence which was left undisturbed." Assignment No. 8 attacks the portion of finding No. 7 "that the loosened portion of said fence folded back as hereinbefore found was drawn back northerly along the stationary portion of said fence for the same distance from the pivot post, upon which it was folded, as the said loosened portion had extended southward from said pivot post while in its stationary condition."

Appellant urges that these findings are not correct, that they have no support in the evidence and are contrary to the

physical facts. It is argued that the *exact* distance is necessary to sustain Kent's testimony as to the manner in which he fastened the ends of the folded back portion of the fence wire; that "if the loosened fence lacked even an inch of stretching back the full sixteen feet, Kent could not have fastened the wires as he said he did." There is no evidence that anyone placed a surveyor's tape or other measuring instrument on the fence to learn its exact measurement. Throughout the trial witnesses gave their estimate of distance and there was not anything that depended upon exactitude of measurement or precision. The court's findings must be read in the light of the evidence and the issues tried out before the court. Kent testified that he pulled the loosened portion back for sixteen feet against the standing fence, stretched it as tightly as he could with his pliers and fastened the ends on the north side of the post, fastening the first, third, and fourth strands of wire around the top strand, third, and fourth wires respectively of the fence. He testified that he could not fasten the lower strands because of snow and that the lower portion of the wire would be out between six and eight inches at the post. He is corroborated by Ross Anderson, of the Anderson Lumber Company, who testified that:

"A. I arrived soon after the fence was bent back to permit them to cut the tree down, and the fence was folded back and fastened along the front of the remaining fence.

"Q. How far back did it reach from the post, that is the pivot post after it was folded around? A. Approximately sixteen feet.

"Q. How was it fastened with reference to the post at the north extremity where the fence was drawn to? A. It was fastened right on the north side of that post, the top line wire was fastened around the top of the other fence."

Several other witnesses testified the distance was "about a rod" and "about sixteen feet" and others that the fence was folded back to a point about two rods from the tree that was cut down, and others twenty-four feet from the tree. No one pretended to give exact measurements.

Assignment No. 9 attacks the following part of finding No. 7 as not supported by the evidence:

"The folded portion of said fence along its whole extent stood upright against the stationary portion thereof, along which it was folded and approximately the same height, the bottom thereof protruding not to exceed 6 to 10 inches out from the stationary portion of said fence and was fastened to the said stationary fence by twisting by means of plyers, the ends of the loosened wires of the first, third and fourth strands thereof around the corresponding wires of the stationary portion of the said fence."

Appellant argues that to so find "the court has had to rely entirely upon defendant's witness who saw the fence some time after it was dismantled," notwithstanding plaintiff's witness "testified definitely that the fence bulged out so as to extend onto the paved walk."

There was a clear conflict in the evidence, and it was for the trial court to find the facts as best as he could after considering the credibility of witnesses and weighing the evidence. Many witnesses testified to the condition reflected in the finding; we shall quote only from a few such witnesses in addition to the evidence already quoted:

Schow, a witness for respondents, testified on cross-examination:

"Q. Did you observe the bottom part extended further out than the top. A. Just as I explained to you it looked like it was right straight along the fence.

"Q. Straight up. A. Yes sir.

"Q. Perpendicular? A. Yes, sir.

"Q. And right flush with the other fence? A. Well, that is the way I observed it. It looked like it was right tight on the fence, of course.

"Q. Standing upright, perpendicular? A. Yes, sir.

"Q. Right flush up with the other fence? A. Yes, sir."

Hailstone, a meter reader for the city, passed on March 18th, stopped and leaned his bicycle against the fence. He described the condition as follows on cross-examination:

"A. I don't think it would be over two or three inches. It looked like part of the fence.

"Q. The wire was standing practically perpendicular? A. Yes sir, running parallel with the other fence.

"Q. You stood your bicycle in an upright position? A. Yes sir.

"Q. The bicycle pointed up and down the sidewalk or in towards the inside of the lot? A. It was parallel with the fence, facing north."

Bench, one of the workmen who cut the tree into stove length firewood, said he walked on the sidewalk many times a day during the week prior to the accident going to get drinking water, passing the folded-back fence, and that the top of the wire folded back was about the same height as the other. On cross-examination he testified:

"Q. This fence was folded back right close to the other fence? A. Yes, sir.

"Q. Almost right against it, is that right? A. Yes, sir.

"Q. And set up perpendicular? A. Yes, sir.

"Q. Right flush with the other fence? A. Yes, sir.

"Q. Was there any strand looped at the point where the fence was folded back? A. I never noticed much of a loop there. It could not have been much, because we always went on that side, to go to get us a drink.

"Q. The fence had been folded back there, so that there was scarcely any loop there? A. Yes, sir.

"Q. It stayed in that condition every day that you were there? A. Yes, sir."

Lundahl, an iron worker, who passed the place on the sidewalk two or three time a day, testified:

"Q. State to the court just what your observations were as to the manner in which it was hooked? A. Well, there was about sixteen feet, I imagine, something like that, pulled around and fastened up to the other fence.

"Q. How with respect to the other fence did it stand? A. Just about the same height, as the other fence.

"Q. And its position as to whether it was leaning or upright? A. It was just about upright, just about the same as the other fence, straight up."

Assignment No. 10 is directed to part of finding No. 7 as follows:

"* * * neither Logan City nor Anderson Lumber Company was guilty of any negligence in the manner in which said fence was folded back and fastened but the same was folded back and fastened in a reasonable, careful and prudent manner."

This, it is said, is a conclusion and not the finding of any fact. It does, however, find support in the other findings of fact, and is a conclusion which the court could well make from the facts found.

Assignment 11 attacks part of finding No. 7 as follows: The fence "remained in substantially the same position and condition from the time it was originally fastened till some time after 10 o'clock P. M. of the day upon which the accident here complained of occurred."

Appellant argues this cannot be true because (1) Kent testified that after the tree was cut down "he took the fence down from where he had fastened it to restore it to its original position, and there is absolutely no evidence as to how he re-fastened it." At the first trial Kent said:

"I was intending to replace the fence, started to, and Mr. Nyman told me I could leave it down so they could take part of the tree out that way after I quit there. I fastened it back again so it would not be loose."

On this trial he testified:

"Q. Now, did you take the wires loos(e) from the way in which you had first fastened it? A. No, sir, that as I recall.

"Q. You didn't touch the wires? A. No, sir.

"Q. You just took the scantling and was going to put that back? A. Yes, sir.

"Q. When he gave you that information? A. Yes, sir.

"Q. When you left there, was the wire in the same condition as to fastening as you have described here to the court, as you first fastened it? A. Yes, sir."

The court's finding is that the wire was "substantially" in the same position and condition. Other witnesses so testified to the same position of the wire.

The second objection to the quoted finding is that the court disregarded the testimony of a number of plaintiff's witnesses who said they saw the wire on the sidewalk at some time during the interval that the fence was dismantled. There is evidence that the wire was out on the paved walk at between 11:30 and 12 o'clock on the night that plaintiff was tripped by it. There is also evidence by many witnesses who passed from two to four times a day during the whole time the fence was dismantled, and also by witnesses who passed occasionally, and as late as 10 o'clock on the night of the accident, that it was in place against the fence and not out on the paved walk at any time.

Gibbons, a man working for the Smith Lumber Company, living at a point where he passed three or four times every day, testified:

"Q. Was there ever any time on the day of the happening of the accident we are talking about, or at any other time, from the time that fence was opened until after the accident, until the day of the accident, when any part of the wire protruded out on the sidewalk? A. No, sir. Not on the pavement. That is what you call the sidewalk, isn't it?

"Q. Yes. That is what I call the sidewalk. Well, having reference to where it was turned back over the posts it was folded back on, the wire would make a bend here and fold back? A. Yes, sir.

"Q. How close was the wire that was folded back to the other wire on that fence that hadn't been disturbed? A. I would say from six to eight inches. I don't think it could get any closer without a stretcher."

Fister, a man in the harness and saddle business, testified:

"Q. During the period while the tree was being cut down, and while the men were logging it up, did you go up and down, as you have stated, four times daily? A. Yes, sir.

"Q. Was there ever any time when you went up and down that any part of the fence was out on the sidewalk? A. Never was. Never bothered me. I never seen any fence. I went along about my business, as usual.

"Q. If there had been a part of the fence out on the sidewalk would you have seen it? A. Absolutely. * * *

"Q. Do you remember particularly on the evening upon which Mr. Jensen was injured; do you remember particularly the hour you went? A. No, I could not tell that. It would be between six and seven, along in there, somewhere.

"Q. Yes. When you went home that night, was there any part of that fence out on the sidewalk? A. Why, there was no part of the fence on the sidewalk at any time when I went home. There was no obstructions on the sidewalk that I know of.

"Q. You are not connected in any way with the Anderson Lumber Company? A. No, sir.

"Q. Nor with Logan City? A. No, sir."

Wilson, a clothing merchant, testified:

"Q. At any time when you went by that place was there any part of the wire that protruded out from the fence any further than the distance where you say it was out where it curved at the post? A. No, sir.

"Q. Was there ever any time when any part of that wire was out on the sidewalk? A. No, sir.

"Q. What time did you go home the night that this accident happened? A. Around about ten o'clock

"Q. That was Saturday night? A. Saturday. We close at nine on Saturday nights. Sometimes we are detained for an hour or a half an hour, or so.

"Q. That is you close your doors? A. Yes, at nine o'clock.

"Q. Did you walk right by that place that night? A. Yes, sir.

"Q. At ten o'clock? A. Yes, sir.

"Q. Was there any wire on that sidewalk when you went down that night going home at ten o'clock? A. No, sir."

It is argued next that it is a "fanciful assumption that some time" after ten o'clock someone unfastened the wire so that it was on the paved walk near midnight when the plaintiff stumbled and fell because of its being on the walk. There was positive evidence from reputable witnesses that the wire was not out on the walk at all on that day up to ten o'clock at night, and also positive evidence that it was out on the walk at about 11:30 or 12 o'clock when the accident happened. The trial judge could hardly do other than he did in so finding the fact. It is not a "fanciful assumption" at all, but a very reasonable one. Appellant testified he walked on

this same paved sidewalk and went in and visited the men logging the tree at about five o'clock in the afternoon of the day of the accident; that he remained there about half an hour and showed the men a card trick. He said that at that time the paved sidewalk was clear and he saw no wire on it although he had seen the wire on it two weeks earlier. The evidence seems to be in hopeless conflict. The court was, however, under the necessity of making a finding of the facts. In doing so he followed what appeared to be the preponderance of the evidence.

By assignments 12 and 13 complaint is made that there is some conflict in the findings after they had been amended by the court on motion of appellant to make them clearly show that the appellant was walking on the paved walk when he caught his foot in the wire. In his brief appellant says, "The court could not, under the evidence, have found ▪ that plaintiff was walking on any part of the sidewalk other than the paved walk." We are not now concerned with liability of defendants, if any, for any condition on the parking spaces adjoining the sidewalk in the face of this concession by plaintiff. There is no point in the argument of inconsistency because when the court's attention was called to an inconsistency in the original draft of findings he made the change so that the findings as signed included the one that the accident happened on the paved sidewalk.

Assignment No. 1 assigns error of the court in permitting the attorney for defendant Anderson Lumber Company to cross-examine the witness J. H. Kent, called by defendant Logan City. Plaintiff made the city and the Lumber Company parties defendant and sought to hold each or both liable. Each defendant was interested in excluding itself from liability and not particularly interested in whether or not the other was held liable. Each might have been held on different facts. In some aspects their interests were adverse, in others not. It was for the court in the exercise of a wise discretion to permit the cross-examination of the witness under these circumstances. The ▪

right could be denied where the interests of co-defendants are identical. 70 C. J. 612. This point was settled against appellant's contention in the decision on first appeal wherein we said respecting a similar objection to cross-examination of a witness produced by the City: "The Lumber Company would be permitted to cross-examine her, which in fact it did attempt to do, but was stopped by the court on the ground that it had no right to cross-examine. No cross-assignment of this ruling as error was made."

Assignments 2, 3, and 4 have to do with a rejected offer by plaintiff to have a witness, one Bingham, testify with respect to the present condition of the fence as to kinks and bends, about three and one-half years after the accident; to testify that he could not pull the fence back as Kent had said he did; and to conduct an experiment to determine whether the fence could be pulled back as Kent said he pulled it. There was no error in these rulings. The then condition of the fence as to kinks and bends after three and one-half years was not material. Testimony that one now might not be able to pull the wire back as another said he did would not be competent. The matter of experiment was wholly discretionary with the trial court and the adverse ruling was not an abuse of discretion. 22 C. J. 790.

Assignments six and seven attack the finding in paragraph six that in opening the fence and fastening it back Kent acted as the agent of the Unemployment Council and not as an agent of either defendant. This is said to be not justified because Kent was an employee of Logan City at the time he dismantled the fence and was acting under the direction of Maughan, the superintendent of the City light and power department, thereby imposing liability on the City; and that when Nyman, an employee and yardman of the Lumber Company directed Kent to leave the fence dismantled the Lumber Company then became responsible for all that Kent had done in connection with the fence.

The evidence clearly shows that the taking down of the tree was a make-work project, sponsored by a committee of citizens known as the Unemployment Council. Maughan was a member of this committee. He loaned Kent, a City employee, to the committee for the purpose of supervising the taking down of the tree. To effectuate the purposes of the committee of obtaining firewood for unemployed men who would cut down and prepare the firewood, the Lumber Company gave the tree and permitted it to be cut down. Kent opened the fence by drawing back one portion of the wire mesh against the other. The Board of Commissioners of Logan City took no part in the tree project. The City neither furnished any funds nor received any funds for the project and obtained no benefit therefrom. The project was in no sense a corporate enterprise or activity. The Unemployment Council outlined the work and directed its accomplishment. Kent was not an agent for either defendant in doing what he did nor was either defendant bound by his actions. Had the wire been out on the sidewalk and had it remained there long enough so that either defendant had constructive or actual notice of such fact, there could be liability on one or both defendants. We are at a loss to know how a City employee who at another's request goes on private property to cut down a tree can make the City liable for his negligence, if any, in the premises.

Mayor Lundstrom testified that the City corporation took no part in the activities of the Unemployment Committee or the tree-chopping program; that the matter never came before the City Commission. The Mayor knew from the newspapers that Maughan was a member of the committee.

Maughan testified he loaned Kent to the committee because he was skilled in removing trees; that the tree or its removal had nothing to do with the light plant. The committee advertised in the papers asking people having trees they could spare to communicate with the committee. Nyman, an employee of the Lumber Company, communicated with the committee and said it had a tree it was willing to

put into the project. There was ample evidence to support the court's finding that in this work Kent did not act as agent for either the City or the Lumber Company.

The other assignments are that the court erred in making conclusions of law and entering judgment for defendants. The merits of these assignments are involved in the matters already treated and hence need not be discussed. There was evidence to support all the findings, and no error was committed by the trial court.

The judgment of the District Court of Cache County is affirmed. Costs to respondents.

HANSON, J., concurs.

WOLFE, Justice (concurring).

I concur, but not in the statement that the trial judge could do no other than he did in finding the fact that the wire was not out on the walk up to 10 o'clock of the night of the accident. Here is a case in which a pedestrian using the walk provided for him is seriously injured, seemingly without fault on his part, by tripping over a wire fence which, in any event, could have been long before removed as a potential danger or, for that matter, could for aught that appears have been turned in the field side of the fence instead of the sidewalk side—and thus never have presented a possible danger. Yet the outcome is that the property owner whose fence it was and who permitted it to be cut and remain unrestored and the city also go "scot free" and the pedestrian is saddled with all hospital costs and serious injuries. True, that is not sufficient to charge negligence, but it constituted a background for scrutinizing the conduct of the moving parties with special care to see if they were not guilty of negligence as charged. In such scrutiny we find apparently reliable witnesses who testified that they did see a portion of the turned back fence on the sidewalk at various times between the date the tree was removed and the accident. There were others who testified that they did

not see it on the sidewalk and still others that they saw it snug up against the undisturbed portion of the wire fence. It would appear that the most natural and reasonable conclusion was that the turned back portion of the fence was at times off and at times partly on the sidewalk, either because, being a buckling springing object, it was subject to such changes of position by the wind or other forces on its sixteen feet of length so as to protrude over the sidewalk or that the hook improvised by Kent which held it to the undisturbed portion of the fence became at times unfastened and was by considerate pedestrians refastened. One fact that seems to stand out from the evidence is that the fence did play back and forth over the sidewalk during eighteen days. In this way the evidence is reconciled along reasonable lines. The judge should do what he instructs the jury to do—reconcile the testimony of witnesses when it can be done. Moreover, the end of the turned back portion of the fence introduced in evidence is not convincing that its stiff strands were so securely fastened as Kent would have us believe.

But whilst the testimony could have been so reconciled and plaintiff permitted recovery, I agree that the trial judge was not without the bounds of permissible conclusion from the evidence when he found the turned back portion of the fence was in the position it had been placed by Kent more than eighteen days before, up to ten o'clock of the night of the accident. We cannot, as a matter of law, say that the conclusion was not supported by some evidence. I therefore concur.

MOFFAT, Justice (dissenting).

I dissent.

It appears that about the first of March, 1933, Mr. Maughan, superintendent of the Logan City light department, and a member of the Citizens Relief Committee, directed an employee of his department, also a committee member to supervise the removing of a large tree standing on

the property of the defendant, Anderson Lumber Co., on the South Main Street of Logan City, which tree was on the east side of the street and practically upon the property line and just inside of the fence marking the east boundary of the sidewalk. The tree had been donated by the Lumber Company to the Citizens Relief Committee, to be felled and cut into firewood for the needy. A short distance north of where the tree was located, the store building of the Lumber Company, facing west and fronting on the main street, was situated. South of the store building and extending some distance to the south and east, the area is open and used as a yard for keeping wire, gates, and other material. The fence, running south from the store building and upon the east boundary of the sidewalk, consisted of a heavy woven wire 47 inches in height, attached to and supported by posts placed about eight feet apart and by a two-by-four board upon the top of the posts. The tree was about eight feet north of the south gate and so close to the fence that it had grown over part of the wire. In order to cut down the tree, it was necessary to remove part of the fence. Mr. Kent and those assisting him, unfastened the ends of the wires from the post south of the tree and adjacent to the gate and also from the post next north. Mr. Kent then pulled the wire, so unfastened, back northward on the outside or sidewalk side of the remaining fence for a distance of approximately 16 feet from the second or pivot post.

Mr. Kent claims that he pulled the unfastened wire back tight and fastened it to the remaining fence. There was considerable snow upon the ground—large amounts having been pushed by a snow plow to the sides of the sidewalk and against the fence, so that the loose end, when pulled out and back against the solid portion, bulged out toward the paved sidewalk that ran parallel with the west side of the solid portion of the fence. Snow prevented the fastening of the bottom wires, so the top wire and third and fourth wires from the top were fastened.

Parallel to the fence, and three feet westerly therefrom, is a paved portion of the sidewalk, the paved portion being about six feet wide; there is a parking space between the west side of the pavement and the curb about twenty feet wide, making the total width of the sidewalk about twenty-nine feet. The spaces on either side of the paved sidewalk were practically upon the same level as the paved sidewalk. The fence was dismantled from the first of March until some time after the 18th of March, 1933,  On the latter date, the plaintiff sustained the injuries which form the basis of his alleged cause of action herein.

At about 11:30 P. M., of the 18th of March, plaintiff and a companion by the name of Lundberg were walking south upon the paved portion of the sidewalk above described; as they reached a point a short distance north of where the tree had stood, plaintiff's left foot became entangled in the loosened part of the wire fence, as a result of which he was thrown to the pavement and sustained injuries to his head and body.

This second trial was had to the court upon stipulation that the cause be tried to the judge sitting without a jury. The cause was so tried. At the close of the trial, the court took the matter under advisement and later rendered judgment in favor of defendants. Findings of fact and conclusions of law were made. Judgment was entered thereon. This appeal was based upon alleged errors in those findings.

The assignments of error attack specifically parts of three of the findings, numbered 6, 7, and 9. Finding No. 7 reads as follows:

"That the loosened portion of said fence, folded back as hereinbefore found, was drawn back northerly along the stationary portion of said fence for the same distance from the pivot post upon which it was folded as the said loosened portion had extended southward from said pivot post while in its stationary condition, and the said folded portion of said fence along its whole extent stood approximately upright against the stationary portion thereof along which it was folded and at approximately the same height, *the bottom thereof protruding not to exceed from six to ten inches out from the stationary portion of*

*said fence*, and was fastened to the said stationary fence by twisting, by means of pliers, the ends of the loosened wires of the first, third, and fourth strands thereof around the corresponding wires of the stationary portion of said fence; that neither the defendant, Logan City, nor the Anderson Lumber Company, was guilty of any negligence in the manner in which said fence was folded back and fastened, but the same was folded back and fastened in a reasonably careful and prudent manner; *that the bottom portion of said fence as it was so folded back and fastened did not extend out upon the said paved sidewalk or any part thereof* and said fence did not constitute any hazard to pedestrians using said sidewalk; *that it remained in substantially the same position and condition from the time it was originally so folded back and fastened till some time after 10 o'clock P. M. of the day upon which the accident here complained of occurred."* (Italics added.)

Among others, objection is specifically made to the following part of the above finding: "that it [the fence] remained in substantially the same position and condition from the time it was originally fastened till some time after 10 o'clock P. M. of the day upon which the accident here complained of occurred." It is to be observed the court found that the part of the fence that had been loosened and folded back stood upright and protruded not to exceed six to ten inches from the stationary part of the fence, as originally fastened.

From this the trial court seems to have concluded that the loosened part of the fence protruded only a short distance on to the sidewalk and that defendants were free from negligence. The court may have also concluded that because the plaintiff had alleged in his complaint that the loosened wire fence protruded over and upon the paved portion of the sidewalk, and the plaintiff was at the time of the injury walking upon the paved portion, that it was incumbent upon him to prove that the wire extended over and upon the paved portion of the sidewalk. At first thought it may appear that plaintiff having alleged that the wire fence obtruded or extended over or upon the pavement, that he was limited to such proof; and that until the wire reached the paved portion of the sidewalk, in so far as allegations are concerned, no negligence is charged in the complaint, nor

is he entitled to recover unless the wire is proved to have obstructed that portion of the sidewalk. Such is a literal construction. It is not disputed that there was three feet of sidewalk space between the east line of the paved portion and the undisturbed fence or fence line. It was alleged that Kent, "with the consent, knowledge, permission and acquiescence of the defendant, Anderson Lumber Company, unnecessarily and unreasonably folded said net wire back upon itself in such a negligent and careless manner that a part of said net wire where it was folded, as aforesaid, projected from a distance of about one foot out, over and upon the paved portion of the said sidewalk, which is one of the public sidewalks of Logan City, thereby making it hazardous and dangerous for pedestrians to pass to and fro upon said sidewalk in this, that the bottom part or portion of said net wire, at the place where it had been dismantled as aforesaid, projected further out on said sidewalk than did the top thereof so that pedestrians using the sidewalk in a lawful, careful and prudent manner would be likely to catch their feet on the bottom of said net wire."

Such allegation charges an obstruction upon the sidewalk and would admit of proof of obstructions upon any part of it from the fence line to "about one foot over and upon the paved portion of the said sidewalk." The fact that the loosened wire was upon one portion of the sidewalk at one time and upon another at other and different times, but at all times for a period of 18 days was extending out and upon some portion of the sidewalk set apart or properly provided for use of pedestrians, was sufficient to charge the defendants with knowledge of the condition and of its character. This is emphasized when we consider that it is not disputed that it was a city employee, upon time paid for by the city or an agency furnishing money to the city for the purpose, who first created the situation and was at all times cognizant of the conditions. The defendant company consented to the loosening of the fence, and, during the whole period, could not have been other than familiar with the

facts. Every witness testified that the fence protruded over and upon some portion of the sidewalk. There is complete agreement upon this point. Some give one distance, some another. Some did not see the wire upon the sidewalk at all—illustration of negative testimony arising from failure to observe. What one does not see is not very substantial evidence of what is there, as compared to the evidence of another who has actually seen what was there at the time and place in question.

There were over forty witnesses testified in this cause. Not all of them as to the location or position of the loosened part of the fence. Some, as indicated, did not see the loosened part. The following witnesses testified as to their knowledge of the position and condition of the fence:

Emil Sjostrom:

"Q. What did you notice with respect to a fence along the west boundary of the Anderson Lumber Company property? * * * A. I was walking on the inside, and as I was walking, my foot just ticked the fence. Q. Describe a little more in detail what you saw there, what fence you have reference to? A. There was a fence on the sidewalk, in my judgment, it seemed to be out, oh, seven or eight inches, or so. Q. Out where? A. Out on the sidewalk. Q. On the paved part of the sidewalk? A. Yes, sir, on the paved part of the sidewalk."

Hyrum Jeppson:

"Q. As you came to the Anderson Lumber Company property, what did you see with respect to a fence? * * * A. As I was walking down, I walked right into the fence, and stopped when I got to the end of the fence, and took it and threw it out of the way. * * * Q. Where was the fence with respect to the paved portion of the sidewalk that you were walking on? A. I should judge the end of it was from a foot to eighteen inches over on the pavement. Q. What part of the fence did you come in contact with? A. * * * I come in contact with the end of the fence. Q. Can you describe whether or not a part of the fence was already standing? * * * A. The fence was just tipped over onto the sidewalk, and also right smooth along the sidewalk. I just got hold of it and threw it right inside of their lot."

Lora Cazier:

"Q. Where were you walking with respect to the paved part of the sidewalk? A. We walked up right up the center of the sidewalk, that

is the two of us together, yes, sir, and when we came to the fence, it was projecting on the sidewalk, and we had to walk out around in order to get past. Q. Do you remember which end of the fence? A. If I remember right, it seemed like it was kinda bulged, one end was loose, like. It was just kinda bulged out on the sidewalk, if I remember correctly."

### Warren K. Burnham:

"Q. Will you describe in a little more detail where the fence was with respect to the snow? A. I have alreday stated that the snow had been pushed off part of the walk, of the sidewalk, between that and the fence, as well as the other side. The fence having been removed was laying with a part of it on this snow that was dug up. It wasn't loose snow. It was a bank of snow, a part of it on the paved walk and part of it on the snow, between that and the fence. Q. You mean part of the wire? A. Part of the wire. Q. How far did that wire extend over the walk? * * * A. From a foot to eighteen inches, to my best judgment, on the paved part of the walk."

### Charles Jenkins:

"Q. What did you do there at the scene of the accident? A. In examining Mr. Jensen my foot caught in a wire. There was a wire there. Q. How is that? A. In examining Mr. Jensen, as to what condition he was in, my foot caught in a wire, as I testified before, and the toe-cap of my shoe was cut in a wire that was there. It was dark night, at that time of night, and there was no regular lighting in the immediate neighborhood there. I could not testify that I saw it, but I know it was there, because I stepped into it. Q. Where was that wire when you stepped into it? * * * A. It was on the parking where Mr. Jensen was."

Alfred Jensen, plaintiff, testifying as to an observation about two weeks prior to the accident, answered as follows:

"Q. Now as you came down by the Anderson Lumber Company property describe what you saw at that time? A. Mr. Peterson and I were walking along, we had to swerve to the right in order to avoid coming in contact with a net wire fence that projected out on the sidewalk. * * * Q. Describe, if you can, a little more in detail the nature of this fence, how it looked, and where it was placed. A. As we came on, after passing this wire, we had to walk very closely between this wire and this west bank of snow, that is, we came very close together, and after passing this bulge in this wire that projected on the sidewalk, I turned around, and I looked at this wire, and it greatly leaned

and went closer to the edge of the sidewalk as it went north, and it was hooked over the wire fence that had never been disturbed * * *"

With regard to the night of the accident, Mr. Jensen related the following:

"Q. Describe what happened as you proceeded south on that walk? A. Mr. Lundberg and I were busily engaged in conversation, and as we walked along my foot became in contact with a wire, and it threw me around till I faced the north, and I heard a crash from this wire, and I was thrown violently to the pavement."

Other testimony shows plaintiff was rendered unconscious by the fall and did not regain consciousness for some time after being taken to a hospital.

D. V. Hess:

"Q. Describe what you saw there with respect to a wire fence? A. There was a net wire on the sidewalk. Q. When you say the sidewalk, what part of the sidewalk do you mean? A. On the pavement. * * * Q. Tell us about how far it extended over the sidewalk? A. Well, I can't recall whether it was clear over the sidewalk, or halfway. It was on the sidewalk. That is all I can tell you."

Samuel Weston:

"Q. Will you describe what you saw with respect to the fence? A. The fence had been cut down and passed north and hooked onto the other fence further north, the part that had been loosened. * * * Q. * * * Did you notice where the bottom part of the fence was with respect to the sidewalk, the paved sidewalk? A. Sometimes it was nearly over to the walk; other times it wasn't so far. It was also stationary. Q. It was in a different position at different times as you went by? A. Yes, sir. Q. Did you observe it at any time when it was extended over the sidewalk? A. It was out on the edge of the sidewalk at one time, I know. * * * Q. You say it was hooked over the other fence; describe what you mean by that a little more in detail, so we can get a picture of it? A. The top wire of the fence which had been taken from the post was horizontal, or was loosened, and was hooked over the top of the wire of the same fence where it had been took further north. Q. Was that the only place that it was fastened that you observed at that time? A. Yes, sir. Q. When you say hooked describe that a little more? A. The top wire is a little heavier than the other wire. It was put in a hook shape and put over the fence back about

two rods from the tree, over the top wire of this same wire only further back."

## James B. Drinkwater:

"Q. Now, will you describe what you saw and what occurred on that occasion as you passed the Anderson Lumber Company property? A. As I walked up the street, having been down south, towards the south end of the city, I ran into the same wire, enough to tell me, on my shoe. Q. Where were you walking? A. I was walking on that sidewalk. Q. You mean the paved walk? A. I won(')t say. I suppose it was paved under the snow. Other people have walked there at other times. I came along at night, and walked in their spaces. * * * Q. What occurred when you caught your foot in that mesh, or that wire? A. Well, I anticipated that I could get a spill, but I managed to save myself, and extricate myself * * *."

## Abraham Lundberg:

"Q. As you proceeded down the street, did anything of an unusual nature happen? A. Yes, sir. * * * When we got down there by, somewhere by the Anderson Lumber Company, why, all at once he (Alfred Jensen) fell down, right square in front of me. Of course, at that time, I didn't know just what was wrong. So I investigated. Of course, he was laying there in the net wire, tight around his feet. The wire came around by the ankle. Q. Did you see his foot in the wire? A. Yes, sir. * * * It was just the whole foot went through the wire, and the wire was tightened up around right by the ankle."

## Joseph H. Kent, witness for defendant:

"Q. Now, what would you say, how far would you say would be the farthest that any part of it (the fence) would probably be out from the straight line of the fence (stationary portion)? A. The lower part of it would be probably be out (from the straight line) between six or eight inches from the post. * * * Q. Question: 'As you were about to replace the fence, he (Nyman) requested you to leave it down?' Answer, 'Yes, sir.' Question. 'And did you leave it down?' Answer, 'Yes, sir, I fastened it back again, so it would not be loose.' Do you remember answering that (in the former trial)? A. I don't recall that. Yes, I believe I do." (Parenthetical remarks and words added.)

## Warren Schow, witness for defendant:

"Q. You didn't examine to see how the fence was fastened? A. Only that it was hooked around the wire."

Frederick Gibbins, witness for defendant:

"Q. Tell us how that was extending relative to the other fence? A. It was pulled back to the wire, was cut down and hooked up with the top wire. It was fastened, as tight as anybody could pull it with their hands."

Other witnesses gave testimony as to the loosened wire being close to or near the undisturbed portion of the fence. Much was said by witnesses as to the manner the loosened wire was attached to the other part of the fence.

From the day the fence was taken down until the day of accident, occurring about 11:30 P. M., of the 18th day of March, 1933, the loosened part extended over and upon some part of the sidewalk within the alleged limits and used portion, either paved or the portion provided for pedestrians by means of removing snow with a snow plow. There is no conflict in the evidence as to that matter. The prevailing opinion takes the position that conflicts arise over the distance the loosened fence protruded upon the sidewalk from the undisturbed fence line. An examination of the evidence reveals no such conflict. Witnesses who testified that the fence was upon the sidewalk observed the condition at times when the fence was so protruding. Other witnesses testified to seeing it when it was not. No witness giving a distance different from another witness was present at the time testified about by such other witness. The only basis upon which the testimony may be harmonized and a finding made according to the evidence is that the loosened part of the fence was movable and at times its location changed, and making allowances for estimated differences in distance that the loosened wire sometimes extended over the paved portion of the sidewalk, sometimes not. Such should have been the finding under the evidence. Whether such a finding would have changed the judgment is not before us. The conclusion, however, seems unescapable that there existed a potentially dangerous situation, that was threatening and might at any time become dangerous to the safety of pedes-

trians using the sidewalk, and in the present instance did so. Both the defendants had knowledge and notice of the situation as revealed by the evidence.

The fact that a person is injured because of some obstruction or other defect in a sidewalk is not evidence of itself that the municipal corporation was negligent in the maintenance of the sidewalk. Nor is such corporation an insurer of pedestrians using its streets and sidewalks. Generally it is incumbent upon the city to keep the center space thrown open to the public for a sidewalk in a condition reasonably safe for pedestrians who may have occasion to use it. Quoting from the headnote in the case of *Coffey* v. *City of Carthage,* 186 Mo. 573, 574, 85 S. W. 532, which reflects the holding of the case:

"A pedestrian has the right to assume that the sidewalk is in a reasonably safe condition, and to act upon that assumption."

The case of *Tucker* v. *Salt Lake City,* 10 Utah 173, 37 P. 261, was a case in which a request was asked directing the jury that if they found from the evidence that the sidewalk where plaintiff was injured was of sufficient width and in such safe condition that by the use of ordinary care injury could have been avoided, they must find for the defendant. The court there said [page 262]:

"The court properly refused to give said instruction, because it was an assumption on the part of appellant that as a matter of law the whole width of the sidewalk need not be in good condition, and that a city is not compelled to keep the whole width of the sidewalk in good condition. That is not the law. 'Where a city opens a sidewalk to public travel, it is bound to keep every portion of it in repair.' *Roe* v. *City of Kansas* [100 Mo. Sup. 190], 13 S. W. 404; *Morrill,* City Neg. 67; *Brusso* v. *City of Buffalo,* 90 N. Y. 679. All persons using streets and sidewalks have the right to assume that they are in good and safe condition, and to regulate their conduct on that assumption. *Kenyon* v. *City of Indianapolis* (Ind.), Wils. [129], 139; *Gibbons* v. *Village of Phoenix* (Sup.), [61 Hun 619], 15 N. Y. S. 410; *Hopkins* v. *Ogden City,* 5 Utah 390, 16 P. 596." (The instant case does not require us to go so far.)

The statute of Utah gives broad powers over streets and sidewalks, especially as to encroachments. Revised Statutes Utah 1933, 15-8-11:

"They may regulate the use of streets, alleys, avenues, sidewalks, crosswalks, parks and public grounds, prevent and remove obstructions and encroachments thereon, and provide for the lighting, sprinkling and cleaning of the same."

15-8-23: "They may regulate and control the use of sidewalks and all structures thereunder or thereover; and they may require the owner or occupant, or the agent of any owner or occupant, of property to remove all weeds and noxious vegetation from such property, and in front thereof to the curb line of the street, and to keep the sidewalks in front of such property free from litter, snow, ice and obstructions."

The Supreme Court of Oklahoma, in the case of *City of Oklahoma* v. *Meyers,* 4 Okl. 686, 46 P. 552, 553, quoted from a Kansas case, *Langan* v. *City of Atchison,* 35 Kan. 318, 11 P. 38, 57 Am. Rep. 165, as follows [page 554]:

" 'The decisions in this state are numerous that cities having the powers ordinarily conferred upon them respecting streets and sidewalks within their limits owe to the public the duty of keeping them in safe condition for use in the usual mode by travelers, and are liable in a civil action for injuries resulting from the neglect to perform this duty.' "

In a suit against the District of Columbia by a woman who was injured by catching her foot against a water plug which projected several inches above the walk, the Court of Appeals of the District held as follows:

"The sidewalks of the City of Washington extend from the curb line bounding the carriageway of the street, to the building line of the houses. * * *

"Then, as to these water plugs, they are put down by the municipality, and the adjacent owner has no control over them, and no right to interfere in any manner with them, except by permission of the municipal authorities; and whether they are placed in the main side walk or in the portion of the sidewalk leading to the house, if they are placed in either, it is the duty of the municipal authorities to see that they do not become dangerous obstructions to those having occasion to use the sidewalks." *Dotey* v. *District of Columbia,* 25 App. D. C. 232.

In a Georgia case, *City of Atlanta* v. *Milam,* 95 Ga. 135, 22 S. E. 43, plaintiff tripped over an iron grating adjoining a building (for the admission of light and air into the basement). The city's liability in the case of this obstruction was defined as follows [page 44]:

"While, of course, in most American cities, water plugs, telegraph and telephone poles, trees, and other things, are allowed upon the margins of sidewalks, and pedestrians, therefore, are not expected to use such portions of the same as are occupied by these obstructions, still there can be no doubt, under the rules of law now settled by repeated adjudications in this and other jurisdictions, *that the city authorities must keep in a reasonably safe condition all parts of its sidewalks which are intended to be used by the public.* It may often happen that in a particular locality a comparatively narrow portion of the sidewalk, on either side or in the middle of it, is much more generally used than other portions of the same; but this does not relieve the municipal authorities from liability for negligence in permitting dangerous obstructions to be continuously maintained in places *upon sidewalks over which the public have a right to pass,* merely because those places are not so much used as others." (Italics added.)

The case of *Bills* v. *Salt Lake City,* 37 Utah 507, 109 P. 745, discusses the law at considerable length from the standpoint of injury arising out of an accident resulting from running into an open excavation upon the street. The court quoted in its opinion the case of *Pettengill* v. *City of Yonkers,* 116 N. Y. 558, 564, 22 N. E. 1096, 15 Am. St. Rep. 442, as follows [page 747]:

" 'A person using a public street has no reason to apprehend danger, and is not required to be vigilant to discover dangerous obstructions, but he may walk or drive in the daytime or nighttime, relying upon the assumption that the corporation whose duty it is to keep the streets in a safe condition for travel has performed that duty, and that he is exposed to no danger from its neglect'."

In a Denver case, *City of Denver* v. *Stein,* 25 Colo. 125, 53 P. 283, where plaintiff stumbled over an iron rod standing in a space about midway between the flagging and the curbstone, and six inches within the Larimer Street sidewalk (placed there originally as a sounding rod for a police tele-

phone box and left standing when the patrol box was removed), the court in deciding the case said [page 284] :

"While there is a conflict between the adjudicated cases upon the question as to whether a city is bound to keep in repair its suburban streets and sidewalks, to their entire width, yet upon principle it is clear, and by the weight of authority it seems to be settled, that with reference to sidewalks in populous portions of the city, and such as are constantly used by the public, its duty is to use reasonable care in keeping them in repair, and free from defects, throughout their entirety."

"*Langan* v. *City of Atchison*, 35 Kan. 318, 11 P. 38 [57 Am. Rep. 165], is a case where a person walking along a street was injured by the falling of a large bill or show board blown down by a strong wind. It was erected on private property, and, as shown by the evidence, in a negligent manner. The court in which the cause was tried sustained a demurrer interposed on behalf of the city, holding thereby that the city was not liable in damages for the injury sustained. The Supreme Court reversed the ruling of the lower court, and in the opinion state the law as follows: 'The decisions in this state are numerous that cities having the powers ordinarily conferred upon them respecting streets and sidewalks within their limits owe to the public the duty of keeping them in safe condition for use in the usual mode by travelers, and are liable in a civil action for injuries resulting from the neglect to perform this duty,'—citing in support of this principle *Jansen* v. *City of Atchison*, 16 Kan. 358, and *City of Salina* v. *Trosper*, 27 Kan. 544."

(Cited from the case of *City of Oklahoma City* v. *Meyers*, 4 Okl. 686, 46 P. 552, 554.)

Nyman, the man who had charge of the yard, knew of, and at least by oral activity participated in the proceedings with regard to the condition of the fence. Mr. Anderson, the manager of the Anderson Lumber Company, gave consent to the operations and could not have escaped knowledge of the situation.

Maughan and Kent were both city employees, and whether or not the men who actually felled the tree were paid by the city or the relief committee does not appear, nor does it matter. It is probable that an arrangement existed similar

to that in the case of Weber County—*Ogden City Relief Committee* v. *Industrial Commission of Utah et al.*, 93 Utah 85, 71 P. 2d 177. There a relief worker was sent by the relief committee to the city to work, and did work, under the direction of city officers or employees. In the case just referred to the following occurs:

"The mere payment of a relief worker's wages from federal and state funds did not make worker an employee of the state or local relief committee nor negative his being an employee of the city which controlled and directed his work, as respects worker's claim for injuries under Workmen's Compensation Act."

I apprehend, had one of the workers been injured while felling the tree, he would have been considered in the same situation. It was also erroneous for the court to find in the instant case:

"That the opening of said fence and the fastening of the same back was all done under the direction and supervision of the unemployment council and was not done by or under the supervision or direction of either of the defendant, Logan City or defendant Anderson Lumber Company, and one Joseph H. Kent, who supervised the opening and fastening of the fence and the cutting down of said tree, was then and there acting as agent for said unemployment council and not as agent of either defendant."

What was done could not have been done lawfully without the knowledge and consent of both the city and the property owner.

This brings us to the question of the manner of fastening the loosened portion of the fence when it was fastened back by twisting the ends of the loosened wires of the first, third, and fourth strands around the corresponding portions of the stationary fence. That said twisting was done by means of pliers, and that said strands were twisted around once and a half, is testified to by Mr. Kent. Exhibit "A" is a portion of the fence alleged to have been fastened, and identified as the portion which was used for twisting around the

stationary fence, as indicated by the oral testimony. The exhibit before the court contradicts the oral evidence as to the manner and means of fastening. The physical condition of the wire (exhibit A) cannot be impeached. Certainly the evidence would indicate that the twisted portion was not fastened by twisting with pliers, as stated, but was hooked sometime during the eighteen-day period in an unstable sort of way, or loosely twisted around the other corresponding wires. Mr. Kent said that he loosened the wire but was told by Mr. Nyman to leave it, about which his testimony is somewhat wobbly. Another witness testified that it was entirely loose and that he threw the loosened wire over the undisturbed part of the fence. This evidence is not contradicted.

No finding of fact made by the trial court will be disturbed in a case tried to the court if there is substantial competent evidence to support it. *Wilson* v. *Salt Lake City,* 52 Utah 506, 174 P. 847; *Bear River Valley Implement Co.* v. *Jensen,* 61 Utah 100, 211 P. 186; *Hanson* v. *Greenleaf,* 62 Utah 168, 218 P. 969; *Carlquist* v. *Quayle,* 62 Utah 266, 218 P. 729; *Booth* v. *Nelson,* 61 Utah 239, 211 P. 985; *Beaver Drug Co.* v. *Hatch,* 61 Utah 597, 217 P. 695. In the particulars herein stated I think the evidence requires findings other than those made by the trial court. I am of the opinion that there was error in the findings warranting a reversal of the judgment.

LARSON, Justice (dissenting).

I concur in the views of Mr. Justice MOFFAT as expressed in his dissenting opinion.