648 S.E.2d 48 (2007)
Mary Ann KOMINAR, as Administratrix of the Estate of Jason Kominar, Deceased, Plaintiff Below, Appellant
v.
HEALTH MANAGEMENT ASSOCIATES OF WEST VIRGINIA, INC., d/b/a Williamson Memorial Hospital, Inc., Pelagio P. Zamora and Pelagio P. Zamora, Inc.; Mingo County Emergency Medical Services Authority, a West Virginia Statutory Organization; Mingo County Ambulance Service, Inc., a Corporation; and Critical Link Ambulance Service, Defendants Below, Appellees.
No. 33215.
Supreme Court of Appeals of West Virginia.
Submitted: March 14, 2007.
Decided: June 7, 2007.
Concurring Opinion of Justice Starcher June 28, 2007.
Marvin W. Masters, Julie N. Garvin, The Masters Law Firm, LLC, Charleston, for the Appellant.
William L. Mundy, Debra A. Nelson, James A. Spenia, Mundy & Nelson, Huntington, for the Appellee, Health Management Associates of West Virginia d/b/a Williamson Memorial Hospital.
Jeffrey M. Wakefield, Elizabeth S. Cimino, Jaclyn A. Bryk, Flaherty, Sensabaugh & Bonasso, PLLC, Charleston, for the Appellee, Pelagio P. Zamora and Pelagio P. Zamora, Inc.
J. Victor Flanagan, Molly K. Underwood, Pullin, Fowler & Flanagan, PLLC, Charleston, for the Appellee, Mingo County Ambulance Service, Inc.
ALBRIGHT, Justice:
This matter is before us as an appeal of the February 2, 2006, order of the Circuit Court of Mingo County by Mary Ann Kominar (hereinafter referred to as "Appellant") in her capacity of administratrix of the estate of her deceased son, Jason Kominar. A six-member jury panel returned a verdict *53 for the defense in the medical malpractice action brought by Appellant. By way of the February 2006 order, the lower court denied Appellant's motion to set aside the verdict or for a new trial. The appellees who were defendants below (hereinafter referred to collectively as "Appellees") are Williamson Memorial Hospital (hereinafter referred to individually as "WMH"),[1] Pelagio P. Zamora, M.D. (hereinafter referred to individually as "Dr. Zamora") and the Mingo County Ambulance Service (hereinafter referred to individually as "MCAS"). Appellant maintains a new trial is warranted because of seven trial court errors. Having completed our review of the extensive record, the various arguments raised and the corresponding law, we find that reversible error was committed for the reasons herein stated, and remand the case for a new trial.

I. Factual and Procedural Background
Given the lengthy trial in this case and the number of errors assigned, we initially provide a general overview of the facts and proceedings in this case. We will supplement these preliminary remarks with additional facts during the course of our discussion of each issue.
After the death of her twenty-two-year-old son on July 12, 1997, following a tragic single vehicle accident, Appellant filed the underlying wrongful death action for negligence in the medical care provided to her son by Appellees. It is undisputed that on this date Mr. Kominar was traveling south on Route 119 in Mingo County, West Virginia when he lost control of his vehicle. The uncontrolled vehicle crossed the median and came to a sudden halt after colliding head on with a rock embankment. There is no dispute that the resulting wreck was the product of a formidable collision. All parties agree to the following time line of events surrounding the accident:
8:40 a.m. Collision occurred.
8:53 a.m. City of Williamson police officer arrived at the accident scene.
8:58 a.m. Ambulance arrived at the scene.
9:11 a.m. Ambulance departed scene for Williamson Memorial Hospital.
9:19 a.m. Ambulance arrived at the hospital.
9:30 a.m. Jason Kominar pronounced dead.
After obtaining medical records and other accident reports, Appellant filed a civil suit on July 12, 1999, in her capacity of administratrix of Jason Kominar's estate. Appellant alleged in the complaint that her son's death was due in part to the negligence of the ambulance paramedics for failing to follow the standard of care and treatment required under the circumstances. Specifically, Appellant claimed that the paramedics caused her son's death by negligently inserting an endotracheal tube[2] into his esophagus rather than into his windpipe. Moreover, WMH, WMH staff and Dr. Zamora were also charged with negligence for not detecting and correcting the improper tube placement. Appellant further maintained in the complaint that all defendants failed to perform their alleged duty of making and preserving medical records as evidence of the events which transpired regarding her son's condition and treatment on the day of the accident. A separate negligent retention claim was charged against WMH.
The case was initially before the Honorable Michael Thornsbury who recused himself prior to trial but after ruling on various in limine motions. One order entered by Judge Thornsbury on February 14, 2002, is pertinent to this appeal and its relevant parts will be elaborated on later in our discussion of statements made during trial regarding survivability of the victim. The Honorable Darrell Pratt was assigned by order of this *54 Court entered September 4, 2002, to preside for the remainder of the case.
On May 2, 2005, after Judge Pratt was assigned to the case, a hearing involving pretrial matters occurred. One of the issues considered was whether there were divergent defenses and hostile interests among the defendants so as to warrant additional peremptory challenges for each of them. The lower court determined that the potential for adverse positioning among the defendants warranted that three separate peremptory challenges be allowed each defendant. Appellant later objected to this ruling without avail.
The lengthy trial in this case began on May 9, 2005, and concluded on May 20. Conflicting testimony regarding Mr. Kominar's condition at the accident scene and at WMH was introduced during the trial. According to the testimony of the paramedics, Mr. Kominar was not moving when they arrived at the accident scene, he had no pulse or blood pressure, was not breathing, his pupils were fixed, dilated and non-responsive to light and the victim was generally unresponsive to pain and other stimuli. Be that as it may, the paramedics said they proceeded with cardiopulmonary resuscitation (hereinafter referred to as "CPR"), intubation, mechanical ventilation and administration of several doses of cardiac stimulating drugs. An electrocardiogram (hereinafter referred to as "EKG") was used by the paramedics to monitor any response of the victim's heart to their resuscitation efforts. According to the testimony of witnesses who either saw the crash or came on the scene of the accident before or while the ambulance and its crew arrived, Mr. Kominar either fell or crawled out of his vehicle when it came to a halt. They also said that Mr. Kominar attempted to lift his head and make crawling movements with his arms once outside the vehicle. Additionally, the eyewitnesses said that Mr. Kominar was having difficulty breathing and was making gurgling sounds and that his eyes were glassy.
When the ambulance arrived at WMH at 9:19 a.m., a trauma team comprised of Dr. Zamora and members of the WMH staff began attending to Mr. Kominar. Dr. Zamora testified that examination of Mr. Kominar revealed that the face was badly bruised, swollen and covered with blood and the pupils of the eyes were fixed and dilated. The doctor related that even after further CPR and other resuscitation efforts were undertaken at WMH, Mr. Kominar remained unresponsive without any indication of a pulse, respiration or blood pressure. Among the methods used for monitoring Mr. Kominar's vital signs was a continuously operating EKG. After pronouncing Mr. Kominar dead at 9:30 a.m., Dr. Zamora ordered a postmortem chest x-ray to determine the cause of death.[3]
Evidence was produced during the trial that reports and medical tests involving Mr. Kominar following the accident had been misplaced, lost, or altered. Appellant maintained that the spoliation of this evidence thwarted her efforts to demonstrate conclusively that her son was not dead at the scene of the accident and that his death was the result of negligence in the delivery of medical care.[4]
Among the people called to testify, a total of nine expert witnesses offered testimony to the jury about the various standards of care and other related matters. Appellant's experts included an emergency medicine specialist, a trauma and chest surgery specialist and a neurologist.[5] Six different individuals were called by Appellees as expert witnesses: WMH called an emergency medical specialist, MCAS called an emergency medical specialist and a trauma surgeon, Dr. Zamora also called an emergency medical specialist and a trauma surgeon, and a radiologist was called on behalf of all Appellees.
Following the close of evidence, the jury deliberated and returned a verdict for Appellees *55 and against Appellant. Appellant timely filed a motion to set aside the verdict or award a new trial. In support of her motion Appellant argued that she was denied a fair trial because the trial court: allowed WMH, Dr. Zamora, and MCAS an excessive number of peremptory challenges; gave a multiple method of treatment instruction to the jury without foundational requirements being met; refused to give Appellant's jury instruction on spoliation of evidence; barred Appellant's efforts to read interrogatory answers of WMH to the jury; permitted violations of rulings in limine to be committed both during opening statements and during the testimony of the city police officer who responded to the accident scene; consented to the use of six expert witnesses by the defendants; and refused to allow Appellant to have the embalmer who attended to her son testify regarding displacement of embalming fluid. After briefing and argument, the court below denied Appellant's motion by order dated February 2, 2006. Appellant then filed her petition for appeal with this Court, renewing all but one of the errors raised below.[6] We granted this request for review by order dated October 26, 2006.

II. Standard of Review
This case involves an appeal from an order denying a motion for a new trial following an adverse jury verdict. We have long held that "the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, Sanders v. Georgia-Pacific Corp., 159 W.Va. 621, 225 S.E.2d 218 (1976). As more fully explained in Tennant v. Marion Health Care Foundation, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995):
We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.
Any standards of review uniquely applicable to the various and diverse issues now before us will be incorporated into the discussion of each issue.

III. Discussion
As previously indicated, Appellant points to seven errors made by the trial court that she contends necessitate a new trial be ordered. We will address the issues raised according to the following groupings: (1) peremptory strikes; (2) spoliation of medical records, including the related issue of the exclusion of the interrogatory answers of WMH; (3) improper references regarding survivability of the victim made during WMH's opening statement and in the course of the city police officer's testimony; (4) limitation on extent of embalmer's testimony; and (5) unfair cumulative effect of testimony of six expert defense witnesses. We proceed to examine with these issues in the order outlined.
A. Peremptory Challenges
Appellant claims the trial court's ruling giving each Appellee three peremptory strikes, or nine collectively, made it impossible for her with only three peremptory challenges to obtain a neutral six-member jury panel to hear her case.
The portion West Virginia Rules of Civil Procedure addressing peremptory challenges in the selection of jurors is contained in Rule 47 and reads as follows in the 2007 Volume of the State Court Rules:
(b) Jury Selection.  Unless the court directs that a jury shall consist of a greater number, a jury shall consist of six persons. The plaintiff and the defendant shall each have two preemptory [sic] challenges which shall be exercised one at a time, alternately, beginning with the plaintiff. Several defendants or several plaintiffs *56 may be considered as a single party for the purpose of exercising challenges, [or the court] may allow additional peremptory challenges and permit them to be exercised separately or jointly.
Whether additional peremptory challenges should be permitted by the trial court when multiple plaintiffs or multiple defendants are parties in a civil suit was addressed in a case decided roughly a month after the trial in the instant case was completed. In syllabus point two of Price v. Charleston Area Medical Center, 217 W.Va. 663, 619 S.E.2d 176 (2005), we held:
In the determination by the trial court of the number of peremptory challenges to be allowed two or more plaintiffs or two or more defendants pursuant to Rule 47(b) of the West Virginia Rules of Civil Procedure, plaintiffs or defendants with like interests are ordinarily to be considered as a single party for the purpose of allocating the challenges. Where, however, the interests of the plaintiffs or the interests of the defendants are antagonistic or hostile, the trial court, in its discretion, may allow the plaintiffs or the defendants separate peremptory challenges, upon motion, and upon a showing that separate peremptory challenges are necessary for a fair trial.
We went on to address in Price what constitutes proof of antagonism or hostility among co-plaintiffs or co-defendants.
[T]he allegations in the complaint, the representation of the plaintiffs or defendants by separate counsel and the filing of separate answers are not enough. Rather, the trial court should also consider the stated positions and assertions of counsel and whether the record indicates that the respective interests are antagonistic or hostile. In the case of two or more defendants, the trial court should consider a number of additional factors including, but not limited to: (1) whether the defendants are charged with separate acts of negligence or wrongdoing, (2) whether the alleged negligence or wrongdoing occurred at different points of time, (3) whether negligence, if found against the defendants, is subject to apportionment, (4) whether the defendants share a common theory of defense and (5) whether cross-claims have been filed. To warrant separate peremptory challenges, the plaintiffs or defendants, as the case may be, as proponents, bear the burden of showing that their interests are antagonistic or hostile and that separate peremptory challenges are necessary for a fair trial.
Id. at Syl. Pt. 3, in part, at 665-66, 619 S.E.2d at 178-79. Thereafter, we established in Price that "the trial court shall set forth, on the record, its reasons for . . . ruling [on a motion for separate peremptory challenges] in a manner sufficient to permit meaningful appellate review." Id. at Syl. Pt. 4, in part, at 666, 619 S.E.2d at 179.
Although the lower court did not have the Price decision to guide it, the trial record and post-trial hearing transcript provide some insight into why the trial court granted supernumerary strikes to each Appellee. In response to the objection raised by Appellant's attorney during jury selection regarding the additional strikes, the record reflects the following:
THE COURT: I have read your case law. I think there is some adverse positions that the hospital has to take with the doctor as far as the hospital and the doctor with the ambulance service. They could  they all have the same, maybe the same, general defense that we think he was dead at the scene. But specifically the hospital is going to say it was the ambulance service that caused the problem or it was Dr. Zamora. Dr. Zamora is going to blame it on the ambulance service. So I think  they are not really in common with their defenses. I think they have to have two strikes.
MR. MASTERS: Your Honor, I have taken the depositions of all of their experts. They are not adverse to one another. They really have sort of gained [sic] up on this situation and you will not see them do anything but hold hands in this courtroom. I have seen their case develop. I know how they plan to try the case.
THE COURT: I think you are generally right. I think the general defense is you're correct on that. But I'm still saying that technically as to legal defenses they *57 are at odds with one another. They are adverse to one another. All of them are adverse to you.
During the November 10, 2005, hearing on the motion to set aside the verdict or for a new trial, the lower court acknowledged the relevancy of the Price decision to the peremptory challenge issue and made the following remarks:
I went back and analyzed those guidelines [from the Price decision] and tried the case. And if you take the pleadings alone, then there's no requirement that the defendants would have to share peremptory challenges.
Were the defendants charged with separate acts of negligence or wrongdoing? Yes, they were.
Was the alleged negligence or wrongdoing occurring at different points in times [sic]? Yes. They were in a span of twenty minutes or so. Each person, each defendant, had a different time frame they were dealing with.
If negligence was found, is it subject to apportionment? It certainly could have been by the jury, thinking that if something was done improperly by the ambulance service, that could have been corrected if noticed by the emergency room nurses and doctors.
Did the defendants share a common theory of defense? They didn't at the time we picked the jury, but ultimately I think they did.
And I don't know, I don't believe . . . there were any cross claims filed by any of the defendants. . . .
And the only way I can view it at this time is if you take those factors and I apply those factors with what information I had available to me at the beginning of the trial and during the jury selection, I would make the same ruling, that it would not have required each defendant to share the peremptory challenge[s].
Mr. Masters certainly had a good point that there has been probably  probably, more than likely, that the hospital and Dr. Zamora would have been  I should have looked at that and said that there's no way that they had antagonistic positions with their defendants. I might have cut it down to six instead of nine.
But in my opinion, if it was a wrong ruling, it was harmless in the totality of the circumstances and the evidence of the case. So, I'm going to deny the Plaintiff's Motion to Set Aside the Verdict based on the unequal peremptory challenges during the jury selection process.
We find the lower court's procedural treatment of the peremptory challenge matter in general compliance with the intent of Price to the extent that the trial court's post-trial discussion affords us some insight into the reasoning behind the decision regarding peremptory challenges. We do not agree, however, with the ultimate conclusion reached by the court below for two reasons. First, the moving parties did not prove at the time separate challenges were granted that a serious, genuine hostility or antagonism existed among their positions. Second, an erroneous decision regarding the grant of separate peremptory challenges to co-parties constitutes reversible error.
As the trial judge commented, the interests of WMH and Dr. Zamora were not examined at the time the decision regarding peremptory challenges was made. As we held in Price, the litigant seeking separate peremptory challenges bears the burden of showing that there is a serious, honest dispute among co-parties before additional challenges may be considered. Syl. Pts. 2, 3, 217 W.Va. at 665-66, 619 S.E.2d at 178-79; see also Tawney v. Kirkhart, 130 W.Va. 550, 561, 44 S.E.2d 634, 641 (1947) (establishing that the basis for award of separate peremptory strikes requires a "proper showing," which Price subsequently defined). It is an abuse of discretion for a trial court to allow separate peremptory challenges absent such showing because of the risk of affording coparties a clear tactical advantage of collectively exercising their challenges against their opponent rather than each other. This leads us to an examination of whether abuse of discretion in these circumstances establishes grounds for reversal.
We recognized in Barker v. Benefit Trust Life Ins. Co., 174 W.Va. 187, 324 S.E.2d 148 (1984), that

*58 a litigant's right to peremptory challenges of prospective jurors is considered necessary to secure an impartial and unbiased jury. This Court has stated that "[t]he right to peremptory challenges is conferred by statute and undoubtedly it is reversible error to deny that right to a litigant entitled thereto." Tawney v. Kirkhart, 130 W.Va. 550, 561, 44 S.E.2d 634, 641 (1947).[7]
174 W.Va. at 190, 324 S.E.2d at 151 (some citations omitted). In the syllabus of Barker we concluded:
Where a trial by jury has been secured by a party to litigation . . . [that] party . . . has a right to an impartial and unbiased jury; and, in order to insure that right, the party is entitled, in the absence of a waiver upon the record, to meaningful . . . peremptory challenges of the prospective jurors. W.Va. R.Civ.P. 47; W.Va.Code, 56-6-12 [1931].
While Barker was decided in a case where a litigant's right to peremptory challenges was completely denied, the same reasoning applies to any situation where a party is divested of the right to a fair trial. W.Va. Const. art. 3, § 13. Refusing to extend the harmless error doctrine to instances where additional peremptory challenges among co-parties were incorrectly allowed, the Oklahoma Supreme Court reflected:
Opportunity to challenge jurors peremptorily invests a party with power to excuse the veniremen without cause. It is a potent tool for excluding those deemed the least likely to be either hostile or neutral. The greater the number of challenges, the greater the party's chances for organizing the jury for a favorable verdict. A jury panel that emerges from a selection process tainted by an exercise of excessive challenges cannot be said to possess the constitutionally-mandated attributes of neutrality and detachment. We regard an absence of a balanced selection process as a cognizable form of prejudice. . . .
. . . A jury selection process that is free from devices injurious to neutrality and detachment of the fact trier is critical to the integrity of the fact finding process. . . .
. . .
Prejudice to the plaintiff will be deemed to have occurred when any additional peremptory challenge is allowed to a defendant who fails to show the factum of a "serious dispute" with one or more codefendants in the case. The decision to grant additional challenges cannot be viewed as a matter of unregulated judicial discretion. Unless the record supports the presence of a serious dispute, prejudice will be presumed and the judgment will be reversed for unwarranted allowance of supernumerary challenges.
Thompson v. Presbyterian Hospital, Inc., 652 P.2d 260, 267-268 (Okla.1982) (footnotes omitted). We recognize that there is a split of authority among the various state jurisdictions as to whether an erroneous allocation of peremptory challenges must be accompanied by a showing of actual prejudice in order to secure a reversal and new trial. See G.R. Jacobi, Effect of Allowing Excessive Number of Peremptory Challenges, 95 A.L.R.2d 957 (1964). However, a requirement that prejudice must be proven to warrant reversal under these circumstances makes little sense and conflicts with our law's fundamental protection of the right to an impartial jury. As the Supreme Court of Kentucky aptly observed:
The requirement of a showing of actual prejudice effectively nullifies the requirements of the rule of allocation of peremptory challenges. To show actual prejudice, the complaining litigant would be required to discover the unknowable and to reconstruct what might have been and never was, a jury properly constituted after running the gauntlet of challenge performed in accordance wit the prescribed rule of the game. Add to this the further obstacle that it is the policy of the law to look with disfavor on attempts to invade the jury's internal process of decision to impeach verdicts except in relatively rare instances.
Kentucky Farm Bureau Mut. Ins. Co. v. Cook, 590 S.W.2d 875, 877 (Ky.1979) (footnote omitted). Accordingly we hold that *59 once an error in the allocation of peremptory challenges is found on appeal because the record below prior to the swearing of the jury does not show a serious dispute constituting hostile or antagonistic positions among co-parties, reversal and a new trial will be granted the adversely affected litigant. Upon remand, the parties and trial court are obliged to follow the procedures set forth in Price to ascertain the need for separate peremptory challenges. In the event that separate strikes are allocated to multiple defendants, the trial court should seriously consider allocating the statutory maximum peremptory challenges[8] to the plaintiff so as to meet the ultimate goal of Price  allocating peremptory challenges in a manner necessary to produce a fair trial for all litigants in a case.
Based upon the foregoing, the case is reversed and remanded for a new trial.[9]
B. Spoliation
Under this topic we address two matters raised by Appellant related to spoliation of certain medical records of MCAS and WMH.[10] One involves the lower court's refusal to give an adverse inference instruction and the other concerns the court not permitting Appellant to inform the jury of some interrogatory answers of WMH about record keeping.
The records in question are the original and hospital copy of the ambulance accident report or "run sheet," the printout of the EKG taken by MCAS paramedics, and the printout of the EKG run at WMH. The evidence produced at trial reflects that the original run sheet was initially lost and when it eventually surfaced it had been facially altered; the hospital copy of the run sheet was never located. The evidence also revealed that the EKG monitor strip run by MCAS was never found. The testimony of three paramedics included speculations that the EKG strips were stapled to the undiscovered hospital copy of the run sheet which was left in the emergency room, or the strips were not salvageable because they were bloodied and trampled during the course of the rescue efforts. The EKG strip of the test performed at WMH was not lost, but only representative portions of the strip were retained in the hospital's medical records.
Appellant contends that since the evidence demonstrated that the records had been altered or destroyed, the lower court should have given the jury an adverse inference instruction regarding the spoliation of the medical records. Both MCAS and WMH contend that the trial court was correct in its ruling because Appellant failed to meet the criteria necessary to support a spoliation instruction.
This Court has said that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is de novo." Syl. Pt. 1, State v. Hinkle, 200 W.Va. 280, 489 S.E.2d 257 (1996). A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Syl. Pt. 4, State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995). In situations where evidence is alleged to have been mishandled in some manner, trial courts must examine whether the party seeking the instruction has proven the following factors before they may give an adverse inference instruction regarding the spoliation:
(1) the party's degree of control, ownership, possession or authority over the destroyed evidence; (2) the amount of prejudice suffered by the opposing party as a result of the missing or destroyed evidence and whether such prejudice was substantial; (3) the reasonableness of anticipating *60 that the evidence would be needed for litigation; and (4) if the party controlled, owned, possessed or had authority over the evidence, the party's degree of fault in causing the destruction of the evidence.
Syl. Pt. 2, in part, Tracy v. Cottrell, 206 W.Va. 363, 524 S.E.2d 879 (1999). These required factors advance the purpose of an adverse inference instruction on spoliation, that is, permitting the jury to assume that the reason that the evidence was altered or destroyed was because it was unfavorable to the position of the offending party. Id. at 371, 524 S.E.2d at 887. We later noted in Hannah v. Heeter, 213 W.Va. 704, 584 S.E.2d 560 (2003), that an adverse inference instruction and sanctions attainable under the provisions of Rule 37 of the West Virginia Rules of Civil Procedure are the sole remedies for correcting the actions of a party who negligently fails in performing a duty of preserving relevant evidence. Id. at 712, 584 S.E.2d at 568.
As to the problem with evidence attributed to WMH, Appellant contends that the EKG strips run at the hospital, as well as the hospital copy of the run sheet and EKG printout from the ambulance, should have been maintained intact by the hospital. Since the paramedics testimony did not establish that the hospital copy of the run sheet was actually delivered to anyone in the emergency room or that the ambulance run EKG strips were ever attached to that copy of the run sheet, the first prong of the Tracy test was not proven. We clearly stated in Tracy that "if . . . the party charged with spoliation of evidence did not control, own, possess, or have authority over the destroyed evidence, the requisite anaylsis ends, and no adverse inference instruction may be given." Tracy, 206 W.Va. at 374, 524 S.E.2d at 890.
A different situation exists regarding the EKG strips run in the emergency room since control is unquestioned. Dr. Zamora testified that only the most suitable portions of the hospital run EKG strip were retained, which represented those periods when CPR was interrupted to determine if the heart was showing any sign of working on its own. Applying the Tracy test, WMH had control of the evidence and either caused or allowed the alteration of the evidence. However, the record is devoid of evidence that the manner in which the portions of the EKG strip were retained by WMH was unusual or improper so as to establish spoliation of this evidence. As such, we find that the lower court did not abuse its discretion in refusing to allow an adverse inference instruction regarding this evidence as it relates to WMH.
Application of the Tracy factors to MCAS leads to a different result. The EKG strips run by ambulance staff and the original as well as the hospital copy of the run sheet were never shown to be out of the possession or control of the business. Nothing in the record proved that any one other than ambulance staff had access to or could cause the loss or alteration of these materials. Since these materials were requested by Appellant shortly after the accident, it would not be unreasonable to expect that the materials would be needed and should be preserved for litigation purposes. The missing and altered evidence hampered the development of Appellant's case since it was the only evidence regarding the deceased's vital signs at the scene of the accident. Although we respect the discretion of the lower court to give an adverse inference instruction, we believe that it was warranted under these circumstances, especially when a critical document was unquestionably altered on its face. Upon any retrial of this matter, the trial court may consider whether such an instruction is appropriate in light of the evidence adduced and if an appropriately drafted instruction is tendered.
Appellant raises another medical records issue involving WMH by claiming that the trial court erred by denying her the right to read relevant interrogatory answers of the hospital to the jury. The answers involved the absence of a triage sheet in the medical records and a list of individuals identified as providing care to the decedent, who in actuality had not attended to him. We find no error in the trial court's conclusions about this matter. The record indicates that the triage sheet was ultimately produced before trial and its initial omission did not *61 prejudice Appellant. As to the list of individuals providing treatment, the hospital explained that it compiled the list from the names of people on duty at the time of the accident holding positions it believed relevant to the injuries sustained. The list was not compiled from the medical records of the decedent and some of the names supplied had not provided treatment. We agree with the trial court that this evidence was not critical to any matter Appellant had to establish in her malpractice claim and it did not bolster her spoliation argument.
C. In Limine Ruling Violations
Appellant maintains that the trial court incorrectly allowed a pre-trial ruling to be violated during the opening statements of WMH and also during the testimony of the investigating city police officer, John Hall. The pre-trial ruling in question appeared in the February 14, 2002, order of Judge Thornsbury, which Appellant maintains disallows evidence regarding the events leading up to the crash and the ability of a person to survive such an accident irrelevant to the central issues of the case.[11] Appellant moved for a mistrial based upon the following opening statements made on behalf of WMH:
Jason Kominar died . . . when his truck went across four lanes of a highway at high speed and crashed head on into a rock cliff.
. . .
[T]he drawing of the accident scene made by the Officer John Hall [referring to a drawing of the scene shown to the jury during opening]. . . . No evidence that he ever attempted to brake. . . . John Hall says high speed motor vehicle accident.
. . .
You can see the front part of the truck basically destroyed [stated while showing a picture of the crash scene].
She also objected to the hospital's citing auto death statistics to support its contention that the victim could not have survived the crash.
Although we find that the opening remarks involving the substance of the anticipated testimony of Officer Hall adhere to the strictures of the in limine ruling, survival statistics from these types of crashes stray from that which the February 14, 2002, order defined as relevant evidence. As clearly stated in the order, "the only evidence that is relevant as to the Plaintiffs [sic] claim against the Defendant's [sic] is evidence as to factors that may have caused or contributed to the decedent's treatment and subsequent death after the time the decedent entered into the care of the Defendants." General statistics about survival rates from these types of accidents do not shed light on whether Mr. Kominar had vital signs at the time treatment was administered or whether the care provided met the standards for delivery under the specific circumstances of the case. Although the jury is instructed that opening statements are not to be considered *62 evidence, such a violation of the established law of the case should not be treated lightly. See Syl. Pt. 4, Tennant v. Marion Health Care Foundation, Inc., 194 W.Va. 97, 459 S.E.2d 374 (1995); Honaker v. Mahon, 210 W.Va. 53, 552 S.E.2d 788 (2001). On retrial, the lower court should require careful and steadfast adherence to the February 14, 2002, ruling throughout the trial.
The portion of Officer Hall's testimony given in response to questions posed by MCAS' counsel that Appellant maintains also violates the in limine ruling is:
Q. Given your experience as a police officer and someone who has investigated hundred[s] of accidents, would it [be] fair to say given the injuries that you observed and the condition of the scene of the accident that you were not surprised to learn that Jason hadn't survived this accident.
A. That is correct.
While the opening statements may have been misleading, this testimony of the police officer was improperly admitted evidence. This testimony falls outside the clear parameters set forth in the February 14, 2002, order for relevant evidence. There was no defensible reason to have a uniformed police officer testify to whether he was surprised Mr. Kominar died except to confuse the issue before the jury by intentionally introducing irrelevant and therefore prejudicial evidence. As we have already determined grounds on which that this case should be remanded, we stress that such a violation of the in limine ruling is ground for reversing the jury verdict and should not be repeated in a subsequent trial.
D. Limitation on Testimony of Embalmer
We next examine Appellant's contention that the lower court erred by refusing to allow her to provide testimony from the embalmer of the decedent on the issue of whether there was any leakage of embalming fluid due to major artery laceration. Appellant maintains that this was relevant evidence in the case inasmuch as the defense experts testified that the decedent had sustained major artery lacerations and had completely "bled out" before the ambulance had arrived at the scene of the accident.
The lower court did not refuse to allow the embalmer's testimony, but only permitted him to be called to testify as a fact witness about his observation as to the condition of the decedent's body. At the post-trial hearing the circuit judge defended his ruling regarding the embalmer as follows:
THE COURT: He was basically going to give a medical opinion, a forensic, medical, postmortem opinion. And that's what I had problems with. . . . [I]f you get to the point where actually an embalmer gets to the point and says there wasn't a particular organ in there, that might be something they can testify to. But to some specific medical postmortem observation I think requires an expert that's trained and qualified in that particular field. And I didn't think the embalmer fit that.
We do not find error on this ground because Appellant had not disclosed the embalmer as an expert witness, did not proffer the credentials, training, or experience of the embalmer on the record, and did not call the embalmer as a witness.[12]
E. Unreasonable Number of Expert Defense Witnesses
Appellant's remaining assignment of error involves the trial court allowing Appellees to elicit supportive testimony from a total of six expert witnesses. Appellant maintains that by consenting to this number of experts for one side in this case, the jury was permitted to be exposed to undue bias by the repeated testimony elicited by the co-defendants during direct and cross-examination of all the defense experts saying the treatment rendered to Mr. Kominar by both MCAS and Dr. Zamora met or exceeded the standard of care.[13] Thus the error assigned has two *63 facets: the number of experts which were allowed each defendant; and the unrestricted cross-examination of the experts by the co-parties.
The six defense expert witnesses included: a radiologist called on behalf of all Appellees; a trauma surgeon and an emergency medicine specialist called by MCAS; a trauma surgeon and an emergency medicine specialist called by Dr. Zamora; and an emergency medicine specialist called by WMH.[14]
As previously noted in our discussion regarding embalmers, Rule 702 of the West Virginia Rules of Evidence governs the admissibility of testimony by expert witnesses. This rule in its entirety provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
W.Va. R. Evid. 702. Application of Rule 702 necessarily involves the determination of whether the evidence is relevant under Rule 401 and whether it withstands the balancing of interests set forth in Rule 403. See 4 Weinstein's Federal Evidence § 702.02[5] (2nd ed.2007); Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 7-2(A)(2) (4th ed. 2000). Under the provisions of Rule 403, a trial court may exclude evidence because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." W.Va. R. Evid. 403.
Rule 611 of the West Virginia Rules of Evidence further addresses the objectives a trial judge should strive to attain in making decisions regarding the presentation and introduction of evidence.[15] As we explained in syllabus point two of Gable v. Kroger Company, 186 W.Va. 62, 410 S.E.2d 701 (1991), "[u]nder Rule 611(a) of the West Virginia Rules of Evidence [1985], the trial judge clearly has discretion to `exercise reasonable control over the mode and order of interrogating witnesses in presenting evidence. . . .'; and in so doing, he must balance the fairness to both parties." The ultimate decision and underlying considerations of the trial court regarding admissibility will not be disturbed on appeal unless they are clearly wrong. Syl. Pt. 4, Rozas v. Rozas, 176 W.Va. 235, 342 S.E.2d 201 (1986); Syl. Pt. 6, Helmick v. Potomac Edison Co., 185 W.Va. 269, 406 S.E.2d 700 (1991).
*64 On the issue of cumulative expert testimony in the present case, the lower court stated at the post-trial hearing that:
I probably could have legally limited the experts on both sides a little bit more than I did, but I wanted to give everybody the opportunity to present their case. . . .
At some point in time, it did become cumulative. But it became cumulative also from the plaintiff's own experts. . . . I think because that there were three different defendants with three different theories of liability on them, that each one of these experts had some little different nuance as to why they believed that the defendant acted within the standard of care.
. . .
. . . I don't know that it could have been limited much more than it was. So, I don't think the cumulative effect of the expert testimony was prejudicial in any way to the plaintiff.
Given the broad discretion afforded trial courts regarding evidentiary matters, we cannot say that the trial court abused its discretion in allowing each defendant to have separate experts. We do note that the hospital's expert specializing in emergency medicine essentially served to bolster the testimony of Dr. Zamora's own expert regarding whether the doctor performed in accord with the standard of care. In essence, there were three experts called to offer testimony supporting Dr. Zamora's treatment of Mr. Kominar. While it is suitable for a trial court to reconsider the number of experts a party may call when there are changes in circumstances during the course of trial such as the directed verdict granted for the hospital in this case, we do not find that refusing to do so necessarily results in an imbalance of fairness to all parties.
The trial court also has broad discretion in limiting the cross-examination of multiple experts when an opposing party objects to the same as cumulative or otherwise legally questionable during the trial. The record reveals that on direct examination the witnesses called on behalf of a particular Appellee only addressed compliance with the standard of care for the party who retained them. However, on cross-examination by other defendants, the testimony of the same experts, either directly or indirectly, gave the impression that the performance of one or the other co-defendant conformed with the applicable standard of care.
We considered the factors a trial court should weigh when presented with a motion to limit cross-examination in order to determine what would be fair to all parties in Jackson v. State Farm Mutual Automobile Insurance Co., 215 W.Va. 634, 600 S.E.2d 346 (2004). Quoting from an earlier decision authored by Justice Cleckley, we said in Jackson that:
In its decision to restrict or limit cross-examination, the circuit court may consider such factors as "the importance of the evidence to the [party's] case, [its] relevance . . . and the danger of prejudice, confusion, or delay raised by the evidence sought to be adduced." State v. Bradshaw, 193 W.Va. 519, 541, 457 S.E.2d 456, 478 (1995).
Jackson, 215 W.Va. at 645, 600 S.E.2d at 357. We adopt this view as sound practice and hold that in responding to a motion to restrict or limit cross-examination, to determine what will be fair to all parties a trial court should weigh and balance such factors as the importance of the evidence to the party's case, the relevance of the evidence, and the danger of prejudice, confusion, or delay that admission of the evidence may cause.
Cases involving multiple co-parties pose a particularly difficult task of balancing these factors to determine whether placing restrictions on the questions which may be asked of expert witnesses by non-adversarial parties may prove necessary in order to achieve fairness to all parties. It is self-evident that cross-examination is a matter of right only when a witness is called by a party whose interests in the litigation are adverse to the party seeking to cross-examine. As summarized in 98 Corpus Juris Secundum, Witnesses § 445 (2002), "[i]t is . . . undesirable for more than one attorney to cross-examine the same witness, and the right may be denied where the interests of the codefendants *65 are identical." (Footnotes omitted.) In Klingbeil v. Truesdell, 256 Minn. 360, 98 N.W.2d 134, 140 (1959), the Supreme Court of Minnesota was faced with the question of whether the refusal of a trial court to allow cross-examination of a single witness by all co-defendants in a personal injury action constituted prejudicial error. Finding the matter within the sound discretion of the trial court, the Minnesota high court reasoned:
The right of cross-examination is an inviolate right, but it presupposes adversity between the party wishing to cross-examine and the party for whom the witness has been called to testify. The right, which is of fundamental importance in the discovery of truth in the trial of a case, is intended for the use of an "opponent" (1) for the purpose of the further examination of a witness proffered by the opposite side so as to bring to light qualifying or contradictory facts and circumstances not disclosed by the witness on direct examination and (2) for the further purpose of developing those facts which may diminish the personal trustworthiness or credit of the witness which may have remained undisclosed on direct examination. 5 Wigmore, Evidence (3 ed.) § 1368, From an examination of the authorities it appears that the right of cross-examination is an absolute right only in regard to adverse witnesses. The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165 [(1865)]; Gurley v. St. Louis Transit Co., Mo.App., 259 S.W. 895 [(1924)]; Citizens Bank & Trust Co. v. Reid Motor Co., 216 N.C. 432, 5 S.E.2d 318 [(1939)]; Aluminum Industries, Inc. v. Egan, 61 Ohio App. 111, 22 N.E.2d 459 [(1938)]; Hall v. Crosby, 131 Me. 253, 160 A. 878 [(1932)]; Proceedings Nebraska State Bar Assn., 37 Neb. L.Rev. 149; Annotations, 38 A.L.R.2d 952, and 43 A.L.R.2d 1000; 58 Am.Jur., Witnesses, § 614.
We find this reasoning to be sound.[16] It would be virtually impossible to try complex multiparty litigation if every party had the unbridled right to cross-examine witnesses called by every other party on issues not related, or only tangentially related, to the witness' testimony in chief. We, therefore, hold that trial courts should carefully examine whether an adversarial relationship exists between co-parties at the time a motion to limit cross-examination is raised in order to avoid the danger of prejudice, confusion, or delay.

IV. Conclusion
Based upon the foregoing, we reverse the February 2, 2006, order of the Circuit Court of Mingo County, and remand the case so that the verdict may be set aside and the matter set for retrial.
Reversed and remanded.
STARCHER, J., concurs and files opinion.
STARCHER, J., concurring.

(Filed June 28, 2007)
I wholeheartedly concur with the majority's decision. As the majority opinion indicates, the trial in the court below derailed at the moment of the flawed jury selection and never recovered thereafter. I write separately, however, to address an evidentiary issue that arose at trial that the majority opinion sidestepped.
The majority opinion briefly mentions the appellant's argument that the trial court erred by refusing to allow expert testimony from the decedent's embalmer. Instead, the trial court would only allow the embalmer to testify as a fact witness.
At trial, a critical issue for the jury to resolve was whether the decedent suffered a major artery laceration during his accident, a laceration which might have been the proximate cause of his death. Defense experts testified that the decedent had sustained a major artery laceration and had completely *66 "bled out" before the ambulance had arrived at the scene of the accident.
The appellant offered the expert testimony of the decedent's embalmer on the issue of whether there was any leakage of embalming fluid due to a major artery laceration. The embalmer, offering his opinion in a deposition, stated that if there had been a tear in the aorta or other artery he would have seen the tear during embalming because the fluid would escape from the tear. The appellant apparently had difficulty obtaining the embalmer's testimony at trial, and the trial court sustained the appellees' objections to use of the deposition testimony. For these reasons, this Court sidestepped the question of the admissibility of the embalmer's expert testimony.
But I believe, on retrial, it is pretty clear that an embalmer could offer an expert opinion under Rule 702 of the West Virginia Rules of Evidence.
According to the provisions of Rule 702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Id. (emphasis added). In Gentry v. Mangum, 195 W.Va. 512, 466 S.E.2d 171 (1995), this Court identified three major requirements of Rule 702 as: "(1) the witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert testimony must assist the trier of fact." 195 W.Va. at 524, 466 S.E.2d at 183. We explained in Gentry "that there is no `best expert' rule. Because of the `liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility" as long as there is a match between the expert's area of expertise and the particular opinion the expert will offer. 195 W.Va. at 525, 466 S.E.2d at 184.
Consequently, pursuant to Rule 702, the question of whether a particular embalmer may be permitted to testify as an expert regarding relevant postmortem observations must be determined in light of the specific educational or experiential qualifications of the individual embalmer, and any evidence adduced as to the capability of the professional embalmer to draw conclusions from such observations. Cf. Syllabus Point 11, State v. Weisengoff, 85 W.Va. 271, 101 S.E. 450 (1919) (testimony of undertaker describing conditions of the body he prepared for burial was admissible in consideration of the witness' background and experience); Tracy v. Cottrell, 206 W.Va. 363, 383, 524 S.E.2d 879, 899 (1999) (same under Rule 702 of the West Virginia Rules of Evidence).
I otherwise concur fully with the majority's opinion.
NOTES
[1] The roster of all defendants actually named in the case below are Health Management Associates of West Virginia, Inc., d/b/a Williamson Memorial Hospital, Inc., Pelagio P. Zamora, Pelagio P. Zamora, Inc., Mingo County Emergency Medical Services Authority, Mingo County Ambulance Service, Inc. and Critical Link Ambulance Service.
[2] According to the Mosby Medical Encyclopedia (revised ed., 1992), an endotracheal tube is "a large tube (catheter) inserted through the mouth or nose and into the trachea . . . [to administer] oxygen under pressure when breathing must be totally controlled." Id. at 286.
[3] No autopsy was performed on the deceased.
[4] The lower court declined Appellant's request to include an instruction to the jury about spoliation of evidence.
[5] The trial court would not permit Appellant to call a radiologist in her case in chief but did permit use of the radiologist as a rebuttal witness.
[6] Appellant did not question the multiple method of treatment instruction in her appeal to this Court. In the event that a new trial does proceed upon remand, we simply note that the law governing this issue is set forth in Yates v. University of West Virginia Board of Trustees, 209 W.Va. 487, 549 S.E.2d 681 (2001).
[7] Tawney has been overruled on other grounds.
[8] See W.Va.Code § 56-6-12 (1923) (Repl. Vol. 2005) (setting a maximum of four peremptory challenges per litigant unless otherwise specifically provided by law).
[9] Although we have determined reversal appropriate in this case on the peremptory challenge issue, the interests of judicial economy are best served by our proceeding to address other assignments of error involving questions that are likely to recur during the course of any retrial. See Sattler v. Bailey, 184 W.Va. 212, 219, 400 S.E.2d 220, 227 (1990).
[10] Neither error directly involves Dr. Zamora.
[11] The wording of the ruling is significant to our discussion and reads as follows:

22. With regard to the Plaintiff's Motions to Exclude the pre-accident investigation and the opinions of John Hall concerning the dynamics of the accident, the Court hereby sustains and GRANTS said motions.
23. The Court notes that any evidence regarding the pre-accident investigation and the opinions of John Hall regarding the dynamics of the accident pertain to theories of contributory negligence on the part of the decedent and are not proper issues for development at trial in this medical malpractice case.
24. As the Court has noted previously, this is a medical malpractice and wrongful death case that necessitates the separation of the cause of the decedent's hospitalization from the cause of the decedent's death. Whether or not the decedent was negligent in bringing about the act that resulted in his hospitalization is irrelevant to whether or not any of the Defendants contributed to the ultimate cause of the decedent's death.
25. The Court finds that the only evidence that is relevant as to the Plaintiffs [sic] claim against the Defendant's [sic] is evidence as to factors that may have caused or contributed to the decedent's treatment and subsequent death after the time the decedent entered into the care of the Defendants.
26. The Court finds that evidence of any investigation of the actions of the decedent and any opinions that Mr. Hall might have regarding the cause of the accident in question and/or the Plaintiff's negligence prior to the injury necessitating medical care are not relevant to whether or not the Defendant's [sic] breached the standard of care, were negligent, or otherwise played a part in the death of the decedent.
[12] No assertion was made that the embalmer's testimony was inadmissible because it was based on the scientific method so as to require the additional inquiries delineated in Wilt v. Buracker, 191 W.Va. 39, 443 S.E.2d 196 (1993).
[13] The experts' testimony was confined to the actions of MCAS and Dr. Zamora because, at the close of the plaintiff's case-in-chief, the court granted WMH's motion for a directed verdict to dispose of the separate medical professional liability claim against the hospital. At the time the defense experts testified, the only claim remaining against WMH involved vicarious liability with regard to the acts of Dr. Zamora.
[14] Appellant's expert witnesses included a cardio-thoracic surgeon, a neurologist and an emergency medicine specialist. As previously noted, the trial court permitted Appellant to call a radiologist as a rebuttal witness, but she chose not to do so.
[15] West Virginia Rule of Evidence 611 is entitled "Mode and Order of Interrogation and Presentation" and provides as follows:

(a) Control by court.  The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
(b) Scope of cross-examination.  (1) Party Witness.  A party may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interest of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination.
(2) Non-party witnesses.  Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the non-party witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.
(c) Leading questions.  Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, a witness identified with an adverse party, or an expert witness, interrogation may be by leading questions.
[16] Our independent research discloses additional jurisdictions recognizing that the right to cross-examination presupposes adversity between the witness and the party conducting the examination. See e.g. Thompson v. Curators of University of Missouri, 488 S.W.2d 617, 620 (Mo.1973) (Cross-examination of a codefendant may be denied "where the interests of the co-defendants are identical."); Jensen v. Logan City, 96 Utah 53, 83 P.2d 311, 316 (1938) ("The right [of cross-examination] could be denied where the interests of co-defendants are identical.").