671 S.E.2d 714

**Laurie Ann MURPHY and Shawn. M. Murphy, Sr., Individually and as Parents and Natural Guardians of Shawn M. Murphy, Jr., a Minor, Plaintiffs Below, Appellants**

v.

**Laura MILLER, D.O., John Battaglino, Jr., M.D., Wheeling Hospital, Inc., Defendants Below,**

**Dennis L. Burech, M.D., West Virginia University Board of Governors, Defendants Below, Appellees.**

No. 33904.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 8, 2008.

Decided Nov. 6, 2008.

Harry S. Cohen, Douglas L. Price, Harry S. Cohen & Associates, Pittsburgh, PA, Counsel for the Appellants.

D.C. Offutt, Jr., Charity K. Flynn, Jon D. Hoover, Offutt & Nord, Huntington, Counsel for the Appellee, Dennis L. Burech, M.D.

Amy M. Smith, Steptoe & Johnson PLLC, Clarksburg.

James C. Wright, Heidi A. Kossuth, Steptoe & Johnson PLLC, Wheeling.

Nancy DeFeo, Steptoe & Johnson PLLC, Morgantown, Counsel for the Appellee, West Virginia University Board of Governors.

PER CURIAM:[1]

This is an appeal by Laurie Ann Murphy and Shawn M. Murphy, Sr., parents and natural guardians of Shawn Murphy, Jr., a minor, from a jury verdict in the Circuit Court of Ohio County in favor of Appellees, Dr. Dennis L. Burech and the West Virginia University Board of Governors (hereinafter "Appellees") in a medical malpractice action in which Mr. and Mrs. Murphy (hereinafter "Appellants") had alleged negligence surrounding the birth of their son. Upon thorough review of the record, arguments of counsel, and applicable precedent, this Court reverses this matter and remands to the lower court for a new trial.

I. Factual and Procedural History

On November 26, 2002, Shawn Murphy was born via C-section at Wheeling Hospital. According to the record, Shawn was immediately in distress, suffering from a low respiratory rate and a faint heartbeat. He was diagnosed with acidosis, a condition in which the patient suffers from the effects of insufficient oxygenation. Appellee Dr. Dennis Burech was on call at Wheeling Hospital on the evening of Shawn's birth and arrived at the hospital between 9:30 p.m. and 9:45 p.m. to lead resuscitation efforts. Dr. Burech contacted the Neonatal Intensive Care Unit at West Virginia University Hospital to arrange for Shawn's transfer to that unit, and he spoke with neonatal nurse practitioner, Melissa Asher during the telephone conversation. There is a factual dispute regarding the contents of their conversation, with Nurse Asher contending that she told Dr. Burech to order bicarbonate, volume, and generous oxygen to be administered to Shawn. Although an order for volume had apparently existed prior to the telephone call, the volume order was later rescinded by Dr. Burech. It is undisputed that no volume or bicarbonate was provided to Shawn until Nurse Asher arrived around midnight to facilitate the transfer. At that time, Nurse Asher realized that Shawn had not received bicarbonate and volume, and she therefore ordered both. Shawn responded positively and was stable enough to be transferred to the Neonatal Intensive Care Unit at West Virginia University Hospital.

A medical malpractice action was initiated against pediatrician Dr. Burech, obstetrician Dr. Laura Miller, obstetrician Dr. John Battaglino, Wheeling Hospital, and the West Virginia University Board of Governors.[2] The Appellants claimed that Shawn's extensive permanent neurological injuries were caused by the negligence of the obstetricians in their care of Shawn prior to birth [3] and that such injuries were exacerbated by Dr. Burech's actions subsequent to Shawn's birth, including Dr. Burech's failure to administer increased volume and perform a blood gas study during the first three hours of Shawn's life.

Subsequent to trial, the jury returned a verdict for the Appellees. The Appellants filed a motion for a new trial, and the trial

1. Pursuant to an administrative order entered on September 11, 2008, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. Dr. Miller, Dr. Battaglino, and Wheeling Hospital were dismissed with prejudice following their settlement with the Appellants.

3. Although the allegations against Dr. Miller are not before this Court, it appears that Dr. Miller had scheduled induced labor for Appellant Mrs. Murphy after a near term amniocentesis was performed confirming fetal lung maturity. The first hospital admission for inducing labor, November 18, 2002, to November 20, 2002, ended in failure to progress despite attempts to induce labor.

court denied that motion by order entered May 11, 2007. Subsequent to the filing of this appeal, Shawn passed away.

The Appellants have presented several assignments of error to this Court upon appeal, including the trial court's method of allocating peremptory challenges; failure to strike biased prospective jurors; errors in the presentation of expert witness testimony; error in granting a Rule 50 motion in favor of the West Virginia University Board of Governors; and error in allowing evidence of what the Appellants perceived to be collateral sources.

## II. Standard of Review

With specific reference to the question of whether a particular potential juror should be excused to avoid bias or prejudice, this Court has explained that the decision is typically within the sound discretion of the trial judge, and this Court reviews for an abuse of discretion. *See West Virginia Dept. of Highways v. Fisher*, 170 W.Va. 7, 289 S.E.2d 213 (1982), *cert. denied, Fisher v. West Virginia Dept. of Highways*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982). This Court has also explained that we "defer to a trial judge's rulings regarding the qualifications of jurors because the trial judge is able to personally observe the juror's demeanor, assess his/her credibility, and inquire further to determine the juror's bias and/or prejudice." *Black v. CSX Transp., Inc.*, 220 W.Va. 623, 627, 648 S.E.2d 610, 614 (2007).

■ Because this appeal is presented subsequent to the denial of the Appellants' motion for a new trial, the following standard of review is applicable: "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). This Court also explained as follows in *Tennant v.*

*Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995):

We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

194 W.Va. at 104, 459 S.E.2d at 381. With these standards of review as guidance in our assessment of these issues, we proceed to address the substance of the Appellants' allegations.

## III. Discussion

### A. Allegations of Juror Bias

The Appellants contend that the trial court erred in failing to strike certain jurors for cause. West Virginia Code § 56–6–12 (1923) (Repl.Vol.2005) entitles parties to a civil action to impartial jurors, specifically providing as follows:

Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause.

The framework in which a determination regarding alleged juror bias must be decided was explicitly provided by this Court in *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002). In that case, this Court explained that the underlying "object of jury selection is to secure jurors who are not only free from improper prejudice and bias,[4] but

---

4. This Court has explained that "[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with

the parties at trial that bias is presumed." Syl. Pt. 5, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

who are also free from the suspicion of improper prejudice or bias." 211 W.Va. at 288, 565 S.E.2d at 410 (footnote added). The *O'Dell* Court further commented upon voir dire as a tool capable of "ferret[ing] out biases and prejudices to create a jury panel, before the exercise of peremptory strikes, free of the taint of reasonably suspected prejudice or bias." *Id.*, 565 S.E.2d at 410.

In *Fisher*, this Court provided guidance to a trial court in analyzing the propriety of removal of a juror whose objectivity is questioned, explaining as follows:

> "It is not enough if a juror believes that he can be impartial and fair. The court in exercising [its] discretion must find from all of the facts that the juror will be impartial and fair and not be biased consciously or subconsciously. A mere statement by the juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which at least suggest the probability of bias. The court in exercising discretion must be convinced that a probability of bias of the juror does not exist. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court."

170 W.Va. at 12–13, 289 S.E.2d at 219 (quoting *Lambert v. Sisters of St. Joseph of Peace*, 277 Or. 223, 560 P.2d 262, 266 (1977)).

Elaborating upon that guidance, this Court stated as follows in syllabus point three of *O'Dell*: "When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror." The *O'Dell* Court continued: "When considering whether a prospective juror is prejudiced or biased,

the trial court must consider all the circumstances surrounding the juror. The trial court must not only consider the prospective juror's promise to be fair but all of the circumstances at issue." 211 W.Va. at 289, 565 S.E.2d at 411.

The temptation for a trial court or counsel to attempt to seek to "rehabilitate" [5] a juror who has provided a questionable response has also been acknowledged. In attempting to restrict that potential, this Court stated as follows in syllabus point four of *O'Dell*: "If a prospective juror makes an inconclusive or vague statement during *voir dire* reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." The key component of the *O'Dell* construct, however, is that a trial court must remove a prospective juror who makes a clear statement indicating a prejudice or bias. In that vein, syllabus point five of *O'Dell* instructs: "Once a prospective juror has made a clear statement during voir dire reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair."

In *Thomas v. Makani*, 218 W.Va. 235, 624 S.E.2d 582 (2005), this Court employed the *O'Dell* paradigm in a medical malpractice action. The plaintiff had appealed a defense verdict, contending that the circuit court abused its discretion by refusing to strike potential jurors who had previously received successful medical treatment from the defendant physician. Utilizing the principles of *O'Dell*, this Court concluded that the trial court did not err in failing to strike the juror

---

Bias, in its usual meaning, is an inclination toward one side of an issue rather than to the other, but to disqualify, it must appear that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality. Prejudice is more easily defined, for it means prejudgment and consequently embraces bias; the converse is not true.

*Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963).

5. Rehabilitation is "[the] commonly accepted terminology to describe the questioning of a juror who has made a statement indicating bias or prejudice. It is an inaccurate term, suggesting a goal of getting a juror to change the biased attitude. The questioning should actually be for the purpose of clarification or elaboration." Daniel J. Sheehan, Jr., and Jill C. Adler, *Voir Dire: Knowledge Is Power*, 61 Tex. B.J. 630, 633 (1998).

for cause.[6] The potential juror had initially indicated that he might possibly "lean toward" the defendant physician. 218 W.Va. at 238, 624 S.E.2d at 585. This Court was "unable to conclude that Juror Evans made a clear statement of disqualifying bias toward Dr. Makani sufficient to disqualify him from serving on the jury." *Id.*, 624 S.E.2d at 585. Although this Court found that the "initial comments required further inquiry by the court[,]" this Court observed that the potential juror had "explained that since he had no medical knowledge, he would more likely believe the doctor who presented the most credible and convincing evidence. He clearly stated that he would not find in favor of Dr. Makani simply because he had treated him fourteen years ago." *Id.* at 238–39, 624 S.E.2d at 585–86. This Court concluded as follows in *Thomas:*

> After reviewing the record in this case, we conclude that the trial court took "special care" to determine that Juror Evans was free from bias and prejudice. The trial court clearly considered the totality of the circumstances and conducted a full inquiry before determining that there was no basis to disqualify Juror Evans from serving on the jury.

*Id.* at 239, 624 S.E.2d at 586.

The *O'Dell* standards were again employed in *Black v. CSX Transportation, Inc.,* 220 W.Va. 623, 648 S.E.2d 610 (2007), a case in which this Court found that a physician should have been excused as a potential juror based upon his clearly expressed bias against personal injury lawyers, asbestos litigation, and awards based on "anything other than pure objective science." 220 W.Va. at 629, 648 S.E.2d at 616. The *Black* Court explained:

> "Dr. Polack clearly expressed a bias against Mrs. Black. Despite his statements that he would render a decision based upon the scientific evidence presented and the trial court's instructions of law, Dr. Polack continued to convey a bias against parties claiming to have been in-

jured by exposure to asbestos and against personal injury attorneys."

*Id.*, 648 S.E.2d at 616.

The case sub judice is very similar to *Black,* to the extent that a prospective juror, Dr. Walter, clearly demonstrated his prejudice and/or bias during voir dire. The voir dire of Dr. Walter was conducted in two phases. First, Dr. Walter answered a series of questions presented to all potential jurors in the form of a written juror questionnaire. Second, based upon Dr. Walter's answers in that questionnaire, he was further questioned in chambers. The answers provided by Dr. Walter on the initial written juror questionnaire revealed that Dr. Walter, in his capacity as a dentist, had been the defendant in what he identified as a "frivolous lawsuit settled out of court...." In response to a written question eliciting his opinion on "providing compensation for pain and suffering, mental anguish, or other emotional damage as the result of the negligence of doctors or other health care professionals," Dr. Walter wrote that "[c]ompensation needs to be provided in some cases but with limits." Dr. Walter also explained in the written juror questionnaire that this state "has some of the highest health care insurance rates because of medical malpractice lawsuits and their verdicts." Further, Dr. Walter stated in the written questionnaire that "frivolous lawsuits cost everyone except the attorneys involved."

During the subsequent verbal evaluation of Dr. Walter in chambers, he answered a question regarding pain and suffering damages, stating that "[i]t would be hard to justify an amount for pain and suffering. I don't know that there's any way you can compensate people for that." Dr. Walter was asked whether he could follow the trial court's instructions concerning damages, setting "aside whatever notions you might have personally about damages...." He replied, "I would try." When questioned further about his ability to disregard "your personal views about what you may think the law is or ought to be...," Dr. Walter responded, "I can say I

---

**6.** The plaintiff in *Thomas* did not move to strike two of the jurors for cause. This Court consequently found that the plaintiff had "waived her right to allege error in this appeal with respect to these two jurors." 218 W.Va. at 239, 624 S.E.2d at 586.

would try to follow the instructions of the Court, yes, whatever."

With regard to his own personal experience as a defendant in a medical malpractice action, Dr. Walter admitted, "obviously, I'm going to be a little bit prejudiced." He also expressed specific hesitation in awarding damages for anything less than a deliberate act, explaining that he would be able to bring a lawsuit seeking to recover damages for a relative of his "[i]f it was a deliberate act, if it was something like that, I guess, deliberate——if it was an accident, if it wasn't. I don't know, it would be a tough call, to be honest." Dr. Walter continued: "We're all human. We all make mistakes. We should be accountable for it, but I don't know." When asked whether he believed medical professionals ought to be less accountable, he responded, "I wouldn't say less accountable, but I think we need to take into consideration what's going on."

The Appellants' motion to strike Dr. Walter was denied, and they therefore chose to utilize a peremptory strike to remove Dr. Walter from the jury panel. Upon this Court's independent examination of the transcript of the voir dire proceedings in this case, we find that the trial court erred in failing to strike Dr. Walter based upon the extensive elements of prejudice he specifically demonstrated during questioning. Based upon Dr. Walter's answers to the written juror questionnaire, as summarized above, the trial court deemed it preferable to continue investigation of Dr. Walter's opinions, and additional elements of bias were revealed during attempts at rehabilitation. Dr. Walter expressed prejudice in several distinct areas, including distaste for medical malpractice actions, adversity toward pain and suffering damages, prejudice based specifically upon his own experience as a defendant in a medical malpractice action brought against him in his capacity as a dentist, and a belief that a medical malpractice action should be based only upon a deliberate act. We find that the trial court's failure to strike Dr. Walter for cause constitutes reversible error and requires reversal and a remand for a new trial.[7]

■■■ The Appellants also contend that two other prospective jurors, Terry Bennet and Kevin Heilman, should have been stricken for cause. Ms. Bennet worked as an administrative assistant in the risk management department of Wheeling Hospital. The hospital had settled prior to jury selection, and Ms. Bennet had no knowledge of such settlement. Although she indicated that she would find it difficult to be unbiased since she worked for Wheeling Hospital, the Appellants did not present the trial court with a motion to strike Ms. Bennet for cause. Consequently, we find that the Appellants have waived their right to allege error in this appeal with respect to Mrs. Bennet. *See Hanlon v. Logan County Bd. of Educ.*, 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997)("Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur in order to preserve the alleged error for appeal."). In pertinent part of syllabus point five of *McGlone v. Superior Trucking Co., Inc.*, 178 W.Va. 659, 363 S.E.2d 736 (1987), this Court explained as follows:

> Where a new trial is requested on account of alleged disqualification or misconduct of a juror, it must appear that the party requesting the new trial called the attention of the court to the disqualification or misconduct . . . and if the party fails to do so, he or she will be held to have waived all objections to such juror disqualification or misconduct, unless it is a matter which could not have been remedied by calling attention to it at the time it was first discovered.

---

7. As noted above, the trial court's denial of the Appellants' motion to strike Dr. Walter required the Appellants to utilize one of their peremptory strikes to remove him from the jury panel. In finding abuse of discretion in failing to strike Dr. Walter, we further find that the Appellants were prejudiced by this erroneous ruling to the extent that the jury which ultimately heard the case returned an adverse verdict. *See Black,* 220 W.Va. at 630, 648 S.E.2d at 617; *Doe v. Wal-Mart Stores, Inc.,* 210 W.Va. 664, 670, 558 S.E.2d 663, 669 (2001) ("A trial court's determination as to whether to strike a juror for cause will be 'reverse[d] only where actual prejudice is demonstrated.' ")(quoting *Miller,* 197 W.Va. at 605, 476 S.E.2d at 552 (additional citation omitted)).

With regard to the Appellants' allegation that prospective juror Kevin Heilman, a chemist, was biased, our review of the record reveals that Mr. Heilman did initially express hesitation to find negligence without an intentional act. Mr. Heilman also stated that he could not award money for mental anguish. When questioned further regarding his beliefs, Mr. Heilman explained that he would "need to have the definition of the standard of care defined to me." Subsequent to Mr. Heilman's questioning, the trial court found that he should not be disqualified for cause, reasoning as follows:

> After hearing his answers and taking all things into consideration, I'm going to go ahead and leave him. He does have his opinions, but what I was impressed by is that he kept coming back to, it would depend on the circumstances, it would have to be proven to him. But if it was proven, he said he could award money and he would not be uncomfortable making a doctor pay if he deviated.

Upon review of the record, this Court finds no abuse of discretion in the lower court's determination with regard to Mr. Heilman.[8] His initial confusion was apparently resolved through additional questioning, and his ability to follow the standard and instructions set forth by the trial court appeared intact.

The Appellants also assign a myriad of other errors. Based upon this Court's decision to reverse and remand for a new trial on the issue of juror bias with regard to Dr. Walter, the remaining assignments of error will be addressed to the extent that they will potentially affect retrial of this matter.

### B. Allocation of Peremptory Challenges

The Appellants contend that the trial court erred in providing each Appellee with peremptory strikes, presenting a marked disadvantage to the Appellants. Rule 47(b) of the West Virginia Rules of Civil Procedure addresses peremptory challenges in the selection of jurors, as follows:

Jury Selection.—Unless the court directs that a jury shall consist of a greater number, a jury shall consist of six persons. The plaintiff and the defendant shall each have two preemptory [sic] challenges which shall be exercised one at a time, alternately, beginning with the plaintiff. Several defendants or several plaintiffs may be considered as a single party for the purpose of exercising challenges, [or the court] may allow additional peremptory challenges and permit them to be exercised separately or jointly.

In *Price v. Charleston Area Medical Center,* 217 W.Va. 663, 619 S.E.2d 176 (2005), this Court addressed Rule 47(b) and held that the litigant seeking separate peremptory challenges bears the burden of demonstrating a legitimate, sincere dispute among co-parties. This examination resulted in syllabus point two of *Price,* explaining as follows:

> In the determination by the trial court of the number of peremptory challenges to be allowed two or more plaintiffs or two or more defendants pursuant to Rule 47(b) of the *West Virginia Rules of Civil Procedure,* plaintiffs or defendants with like interests are ordinarily to be considered as a single party for the purpose of allocating the challenges. Where, however, the interests of the plaintiffs or the interests of the defendants are antagonistic or hostile, the trial court, in its discretion, may allow the plaintiffs or the defendants separate peremptory challenges, upon motion, and upon a showing that separate peremptory challenges are necessary for a fair trial.

In syllabus point three, the *Price* Court[9] expanded upon the necessity for proof of antagonism among co-parties, as follows.

> In determining whether the interests of two or more plaintiffs or two or more defendants are antagonistic or hostile for purposes of allowing separate peremptory challenges under Rule 47(b) of the *West*

---

**8.** When the Appellants' motion to strike Mr. Heilman was denied, they utilized a peremptory strike to remove him from the jury.

**9.** *See also Kominar v. Health Management Associates of West Virginia, Inc.,* 220 W.Va. 542, 551, 648 S.E.2d 48, 57 (2007)("It is an abuse of discretion for a trial court to allow separate peremptory challenges absent such showing because of the risk of affording co-parties a clear tactical advantage of collectively exercising their challenges against their opponent rather than each other.")

*Virginia Rules of Civil Procedure,* the allegations in the complaint, the representation of the plaintiffs or defendants by separate counsel and the filing of separate answers are not enough. Rather, the trial court should also consider the stated positions and assertions of counsel and whether the record indicates that the respective interests are antagonistic or hostile. In the case of two or more defendants, the trial court should consider a number of additional factors including, but not limited to: (1) whether the defendants are charged with separate acts of negligence or wrongdoing, (2) whether the alleged negligence or wrongdoing occurred at different points of time, (3) whether negligence, if found against the defendants, is subject to apportionment, (4) whether the defendants share a common theory of defense and (5) whether cross-claims have been filed. To warrant separate peremptory challenges, the plaintiffs or defendants, as the case may be, as proponents, bear the burden of showing that their interests are antagonistic or hostile and that separate peremptory challenges are necessary for a fair trial.

In its discussion of the issue of allocation of peremptory challenges in *Price,* this Court cited with approval the methodology employed by the Supreme Court of Kentucky in *Sommerkamp v. Linton,* 114 S.W.3d 811 (Ky. 2003). In that medical malpractice case, the issue of the degree of disparate interests was raised, and the Supreme Court specified that "the rule does not require the defendants to demonstrate a certain degree of antagonism, but only the existence of antagonism between the various healthcare providers at the time of jury selection. . . ." 114 S.W.3d at 816; *see also Bowman v. Perkins,* 135 S.W.3d 399 (Ky.2004). In *Bayless v. Boyer,* 180 S.W.3d 439 (Ky.2005), the Kentucky Supreme Court addressed the issue of whether the determination of antagonism is to be based upon pretrial positions or actual trial proceedings. The Court explained as follows:

Appellants have provided no specific rationale for reversing the trial court on this issue and rely instead on a general objection that the Appellees pursued a common defense strategy throughout the trial. Ap-

pellees have each noted several instances during the trial which demonstrated their antagonistic interests. That being said, there is no need to recount each of those instances here. As noted above, a trial court's ruling [regarding peremptory challenges] . . . is necessarily made prior to trial and a review of that decision need not focus on what actually occurred during the proceedings.

180 S.W.3d at 448.

■ In the present case, the dispute between Dr. Burech and Nurse Asher regarding Nurse Asher's alleged recommendations during the telephone conversation forms the basis for the divergence of interest between the Appellees. The Appellees maintain that the lower court properly acknowledged this issue and provided each Appellee with peremptory strikes, effectively providing the Appellees with twice the number of peremptory challenges as the Appellants enjoyed. The Appellants maintain that although the Appellees are separate parties, there is not sufficient divergence of interest to justify the allocation of peremptory challenges utilized by the trial court since the Appellees' defenses, experts, and theories were intertwined and not entirely hostile to one another.

Examining the factors enumerated in *Price,* this Court observes that the record reveals that the respective interests of Dr. Burech and Nurse Asher are indeed antagonistic. Separate claims of negligence were alleged against Dr. Burech and Nurse Asher, the acts occurred at different points in time, they were represented by separate counsel, and the verdict form submitted to the jury required it to apportion liability, if found, between Dr. Burech and the West Virginia University Board of Governors based upon Nurse Asher's actions. The two did not share a common defense theory, and a specific factual dispute arose regarding the conversation that occurred during the telephone call on the night Shawn was born. The Appellants claimed that Nurse Asher was obligated to advise Dr. Burech regarding treatments, Nurse Asher contended that she did provide such recommendation; and Dr. Burech disputed that testimony. The provision of bi-

carbonate, volume, and generous oxygen was one of the very essential issues at trial.

In examining this issue, the trial court very astutely explained:

> There is sufficient adversity between the defendants; there's separate counsel; there's separate theories set out against each defendant within plaintiffs' complaint; separate answers were filed. It's my recollection that the defendants each have their own experts. The defendants, I believe, are on different sides of the same issue, which is, at least in my estimation, a rather critical issue in this case. The Board of Governors and Dr. Burech, I believe, have a conflict between themselves and their respective positions, as well as their respective recollections of the events that lead us here today. And, therefore, I do not believe that the defendants share a common defense theory between them, enough to warrant the Court ordering them to share strikes.

This Court concludes that the trial court was keenly aware of the antagonism inherent in the situation and properly provided peremptory strikes accordingly.

### C. Partial Judgment as a Matter of Law

■ The trial court granted partial judgment as a matter of law, pursuant to Rule 50(a) of the West Virginia Rules of Civil Procedure [10] to the Board of Governors, holding that the Appellants had failed to prove a violation of duty by Nurse Asher regarding the administration of volume to Shawn. The trial court specified that Nurse Asher had no duty to advise Dr. Burech to employ volume in his treatment of Shawn since an order for volume had already existed in Dr. Burech's own orders prior to the telephone conversation between Dr. Burech and Nurse Asher. The Board of Governors contends that even if that order had not already existed in the file, Nurse Asher was under no duty to order Dr. Burech to do any specific thing during her conversation with him.

■ In syllabus point three of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996), this Court held as follows:

> The appellate standard of review for the granting of a motion for a [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a [judgment as a matter of law] when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a [judgment as a matter of law] will be reversed.

In the present case, the Appellants' expert, Dr. Null, had testified that the volume order was "more likely than not" already on Dr. Burech's order sheet at the time of the phone call in question. Moreover, Dr. Burech also testified that he was "certain" that the cancellation of the volume order, a choice Dr. Burech made upon weighing the risks and benefits of administration of volume, occurred after the telephone conversation with Nurse Asher. When asked whether "at the time you spoke to Melissa Asher, you had in your head, in your mind, and on that piece of paper, the thought process of providing volume," Dr. Burech answered, "That's correct." Thus, the trial court's conclusions regarding the absence of any duty on the part of Nurse Asher to order the administration of volume were based upon the Appellants' own medical expert, as well as the testimony of Dr. Burech. The trial court carefully reviewed the issue and concluded as follows:

> [T]he volume order was on the sheet at the time of the phone call, and that, therefore, there could not be a deviation from the standard of care, inasmuch as Nurse Asher had no duty to recommend, advise, in-

---

**10.** Rule 50(a)(1) of the West Virginia Rules of Civil Procedure provides as follows:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may

determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

struct, however you wish to characterize it, of something that was already being considered or on the order sheet.

The trial court continued by explaining that there was "no credible evidence which exists from which a reasonable jury could conclude that a deviation by Nurse Asher from the standard of care was defined by Dr. Null, plaintiffs' expert."

Further, although the Appellants contend that the trial court advised the jury that it had dismissed part of the claim against the Board of Governors, the trial court actually stated only the following:

> You are instructed that the Court has ruled that Melissa Asher had no duty to advice (sic) Dr. Burech to give volume to Shawn Murphy, therefore, you are not to consider whether or not Melissa Asher advised Dr. Burech to give volume in determining if she deviated from the standard of care.

Based upon this Court's review of this issue, we find no reversible error in the trial court's determination that the partial judgment as a matter of law was appropriate. The evidence was clear that the issue of the administration of volume had already been considered prior to the telephone conversation between Nurse Asher and Dr. Burech. The trial court correctly found that Nurse Asher was under no duty to advise Dr. Burech to provide volume under these circumstances. The issue of Nurse Asher's advice to Dr. Burech with regard to oxygen and bicarbonate was still permitted to proceed to the jury.

### D. Testimony Regarding Availability of Future Benefits

The Appellants presented the testimony of Dr. Ellen Kitts regarding Shawn's participation in West Virginia's "Birth to Three" program until he reached three years of age and his receipt of certain therapies through the public school system. Dr. Al Condelucci, a life care planner, also testified on behalf of the Appellants with regard to a life-care plan he had authored for Shawn. During cross-examination of Dr. Condelucci, testimony was admitted regarding educational or other public benefits or services available to Shawn. The Appellants' objection to such testimony as collateral source evidence was overruled, and they now assert error regarding the introduction of such evidence as an assignment of error on appeal.

West Virginia Code § 55–7B–9a(a)(2003)(Supp.2008) addresses the potential reduction in compensatory damages for economic loss based upon payments from collateral sources and provides that testimony regarding collateral sources [11] is permitted "after the trier of fact has rendered a verdict." Specifically, the statute states:

> (a) In any action arising after the effective date of this section, a defendant who has been found liable to the plaintiff for damages for medical care, rehabilitation services, lost earnings or other economic losses may present to the court, after the trier of fact has rendered a verdict, but before entry of judgment, evidence of payments the plaintiff has received for the same injury from collateral sources.

---

**11.** West Virginia Code § 55–7B–2(b) (1986) (Supp.2008) defines collateral source as "a source of benefits or advantages for economic loss that the claimant has received from" any of the following:

(1) Any federal or state act, public program or insurance which provides payments for medical expenses, disability benefits, including workers' compensation benefits, or other similar benefits. Benefits payable under the Social Security Act are not considered payments from collateral sources except for Social Security disability benefits directly attributable to the medical injury in question;

(2) Any contract or agreement of any group, organization, partnership or corporation to provide, pay for or reimburse the cost of medical, hospital, dental, nursing, rehabilitation, therapy or other health care services or provide similar benefits;

(3) Any group accident, sickness or income disability insurance, any casualty or property insurance (including automobile and homeowners' insurance) which provides medical benefits, income replacement or disability coverage, or any other similar insurance benefits, except life insurance, to the extent that someone other than the insured, including the insured's employer, has paid all or part of the premium or made an economic contribution on behalf of the plaintiff; or

(4) Any contractual or voluntary wage continuation plan provided by an employer or otherwise or any other system intended to provide wages during a period of disability.

Upon thorough review of this matter, this Court declines to find reversible error on this issue. In *Ratlief v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981), this Court observed that the admission of collateral source evidence is harmless where "the jury did not reach the damage issue but disposed of the case against the plaintiff on the liability issue." *Id.* at 788, 280 S.E.2d at 590. That is precisely the situation in the present case since the jury found for the Appellees on the issue of liability and never reached the issue of damages.[12] We consequently find that any admission of testimony regarding future benefits to which Shawn would have been entitled was harmless.[13]

### IV. Conclusion

Based upon the foregoing, this Court reverses the trial court's denial of the Appellants' motion for a new trial and remands this matter to the trial court for a new trial.

Reversed and remanded.

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH sitting by temporary assignment.

---

**12.** This Court also notes that while the Appellants complain only about testimony concerning the future benefits which would have been available to Shawn, the Appellants also introduced testimony through Dr. Kitts regarding Shawn's receipt of public services such as the "Birth to Three" program.

**13.** The Appellants also assert error with regard to the scope of the testimony of experts, Dr. Cicco and Dr. Balducci. Based upon this Court's decision to reverse and remand for a new trial on the issue of juror bias, we do not address the testimonial issues regarding these experts.